#29296-r-DG
**2021 S.D. 18**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STEVEN BILLMAN,

Claimant and Appellant,

v.

CLARKE MACHINE, INC.,

Employer and Appellee,

and

SENTURY INSURANCE A
MUTUAL COMPANY,

Insurer and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHRISTINA L. KLINGER
Judge

* * * *

JAMI J. BISHOP of
Johnson, Janklow, Abdallah,
   & Reiter, LLP
Sioux Falls, South Dakota

RENEE H. CHRISTENSEN
Sioux Falls, South Dakota

Attorneys for claimant and
appellant.

THOMAS J. VON WALD
BRIAN A. ZIELINSKI of
Boyce Law Firm, LLP
Sioux Falls, South Dakota

Attorneys for employer, insurer,
and appellees.

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 16, 2020
OPINION FILED **03/10/21**

#29296

GILBERTSON, Retired Chief Justice

[¶1.]       During his employment at Clarke Machine, Inc. (Clarke), Steven Billman (Billman) suffered a work-related injury that caused the amputation of a portion of his left leg.  As a result, Billman applied for permanent total disability benefits.  The Department of Labor and Regulation (Department) denied Billman's application finding him not obviously unemployable and that he failed to conduct a reasonable job search.  He appealed to the circuit court which affirmed the Department's findings.  He appeals, arguing that the Department's conclusions that he is not obviously unemployable and, alternatively, that he failed to conduct a reasonable job search are both clearly erroneous.  We reverse.

## Background

[¶2.]       Billman was sixty-two years old at the time of his Department hearing. He has Type I diabetes with peripheral neuropathy.[1]  His education includes an associate degree in electronic technology, completion of the core requirements for mechanical computer-assisted drafting, and a one-year certificate in computer-aided design (CAD) training.  Billman's work history spans more than forty years, including positions as an auto-mechanic, manufacturing technician, mechanical/design engineer, railroad designer, and senior trackwork designer.  He also remodeled houses.

[¶3.]       In March 2014, Clarke hired Billman to perform drafting using a CAD program.  Billman had no experience using Clarke's software so Clarke offered

---

1.     Peripheral neuropathy is a condition that often causes weakness, numbness, and pain, usually in an individual's hands and feet.

training, but Billman opted to self-train. Billman has a history of being a quick study and learning new drafting software on-the-job. At the time of his injury, Clarke had moved Billman from drafting to operating a plasma cutter's program. Clarke had workers' compensation insurance through Sentry Insurance, a Mutual Company (Insurer).

[¶4.]     On February 6, 2015, while operating the plasma cutter, a one-inch metal shaving pierced the sole of Billman's shoe entering the joint of his foot. He did not feel the initial pain due to his Type I diabetes but noticed the injury upon returning home from work and finding blood on his sock.

[¶5.]     On February 9, Billman notified Clarke of his injury and sought treatment at the local clinic. Due to the wound being infected, he was transferred by ambulance to Avera Hospital in Sioux Falls. On February 14, the infection made it necessary to amputate his left leg just below the knee. Doctors released Billman from the hospital on February 18. Upon release from the hospital, he moved in with his father and sister in Volga, South Dakota,[2] where he remained through the date of the hearing. He received a prosthetic leg in June 2015, but he regularly experienced issues with its fit.

[¶6.]     Dr. Thomas Ripperda (Dr. Ripperda) issued his permanent work restrictions, in April 2016, at which time he gave Billman an eighty-percent permanent partial disability rating and permanent restrictions of light-duty work

---

2.    The parties both refer to Billman residing in Volga. However, during the Department hearing, Billman confirmed that his actual residence is in Lake Campbell, which is south of Volga. He conceded that Brookings, Sioux Falls, and Madison are all within sixty miles of his residence.

and no lifting more than twenty pounds occasionally. He is restricted from going up and down ladders, squatting or kneeling on his left leg, and balancing. Tyler Clementson (Clementson), Billman's prosthetic specialist, however, opined that Billman's physical capabilities are that of an active adult or athlete with a prosthetic.

[¶7.] Since the amputation, Billman has also experienced trouble controlling his Type I diabetes. On multiple occasions, family members called medical professionals to his home because he was unresponsive. The reports stated the incidents were due to diabetic-associated hypoglycemia.

[¶8.] In June 2016, Billman underwent a second surgery for a left stump revision due to fluid collection and pain in his stump. After the surgery, Billman had to remain non-weight bearing and could only perform seated work. In August 2016, Billman returned to his permanent work restrictions.

[¶9.] As a result of the injury, Billman received a permanent partial disability award of $57,350.40, at a weekly compensation rate of $448.05 or $11.20 per hour for two-and-a-half years. The Social Security Administration (SSA) deems Billman disabled.

[¶10.] In April 2017, Billman submitted a petition for hearing to the Department on the issue of whether he is entitled to permanent total disability benefits. The Department heard the case on December 7, 2018.

[¶11.] At the hearing, Billman discussed his work history, training, and physical limitations, beyond those listed in Dr. Ripperda's work restrictions. He testified that he cannot get down on his knees. It is difficult for him to walk on ice

and uneven surfaces.  He must hold the handrail when using stairs.  If he turns too quickly, he falls because walking is now a deliberate act.  Multiple times during the day, Billman must replace his prosthetic leg's sock lining because his leg tissue shrinks.  If his prosthetic becomes too lose, his foot turns at a fifteen- or twenty-degree angle.  He cannot stand for eight hours straight and can only sit for roughly an hour-and-a-half and then he must stand.  If he takes off his prosthetic, he can sit longer, but he can sit no more than a combined total of four to five hours per day.  He also does not perform many of the activities he did prior to the accident.  He can still engage in activities like deer hunting and fishing but only at a five-percent level.  However, he goes pheasant hunting with difficulty roughly three times a year and continues to do woodworking.  Billman can drive his vehicle and can operate a snow blower and lawnmower but must hold on to the machine for balance and sit down after an hour.

[¶12.]      Billman also testified that he did not start applying for jobs until March 2018 because he was re-learning to use his leg.  After the second surgery, he had to restart the healing process.  His job search included twelve positions in the drafting and design field.  He felt unqualified to expand his search outside his known area and believed his prosthetic would be a problem.  However, only one prospective employer informed him that the prosthetic was an issue.  Billman's training is antiquated.  He is versed in SolidWorks and MicroStation, but most employers now use AutoCAD.  He also testified that his age affects his ability to find employment.

[¶13.] Billman's vocational expert, Tom Audet (Audet), is a certified rehabilitation counselor. At the hearing, he discussed that his job search for Billman focused on the Madison and Brookings labor markets. Audet determined that retraining was not a viable option for Billman as he would be around sixty-five, the age of retirement, upon completion of a program. However, he acknowledged that some training options might be shorter. Notably, Audet's job search considered Billman's physical limitations, in addition to Dr. Ripperda's work restrictions. Audet testified that work does exist within Billman's limitations and restrictions and that his search focused on positions in the drafting area. However, he stated that Billman's age and that he must take four to five days off a month, during which he must remove his prothesis, both affect his employability. When considering all Billman's limitations, Audet believed Billman conducted a good-faith job search and that because of his age he was not appropriate for retraining programs because he would reach the age of retirement by the time of completion. Audet concluded that Billman was best suited for the sedentary drafting and design jobs for which he had applied but did not receive employment.

[¶14.] Clarke's and Insurer's vocational expert, Kara Merkwan (Merkwan), is a vocational rehabilitation consultant, but she is not a certified rehabilitation counselor. At the time of the hearing, she was completing her master's degree in rehabilitation counseling and had performed career counseling since 2012.[3] She testified at the hearing that her report did not consider Billman's physical

---

3. She currently holds a master's degree in human services counseling and marriage and family counseling from Liberty University.

limitations beyond Dr. Ripperda's work restrictions, and she did not interview Billman when preparing her report. Merkwan believed Billman should have started his job search earlier and that his search needed to expand beyond the drafting and design field. She admitted that Billman's age is a hinderance to him finding employment.

[¶15.] Merkwan's initial December 2017 assessment incorrectly listed Billman's residence as Howard. As a result, she conducted a market survey of Howard, Madison, Mitchell, Huron, and Brookings. She reported a dispatcher position at J&C Transport for $15-18 per hour in Madison, a full-time position at Mills Construction, Inc. in Brookings as an architectural technician, a full-time drafter CAD operator III at Alutiiq in Huron, and a full-time position at Trail King Industries in Mitchell as a design engineer. However, Audet contacted J&C Transport and discovered that the dispatcher position was no longer available. An employee at Mills Construction stated that Billman was probably not qualified for the Mill's position due to his experience in manufacturing and not architectural design. The other positions in Huron and Mitchell were outside Billman's "community" as defined by statute.

[¶16.] Merkwan modified her July 2018 assessment by excluding the labor market of Huron, but she still included the market of Mitchell. She also altered the search based on Billman's software capabilities; her previous search assumed Billman could adapt to the AutoCAD program. However, her report did not consider Billman's issues with traversing stairs and his need to sit for four to five hours per day. Her report included a dispatcher position at Express Pros Staffing in

Brookings for $13 per hour, a delivery driver position at Pizza Ranch in Brookings for $9 per hour plus gas and tips, a delivery driver position at Pizza Hut in Brookings for $8.85 plus gas and tips, and a security guard position at 1st Class Security in Mitchell for $12-13 per hour.

[¶17.] Merkwan's final December 2018 report included the appropriate communities of Brookings, Sioux Falls, and Madison. It reported a hotel desk receptionist position at DenWil Hospitality Group in Brookings at $12 per hour and a CAD drafter position at Express Pros Staffing in Sioux Falls for $16-$18 per hour.

[¶18.] The Department concluded that, while Billman struggles with his amputation, he failed to show that his physical condition coupled with his education, training, and age make it obvious that he is in the odd-lot total disability category. The Department determined that Billman can perform light-duty or sedentary work with reasonable accommodations, whether in the field of computer-aided design or a new field. Additionally, in the Department's view Billman's *training* and *experience* make him a worthwhile potential employee with an ability to adapt and learn new technology. The Department found no clear evidence that Billman's *age* prevents him from finding employment. It found Billman's *physical condition* limits his ability to walk, climb, and balance, but noted that Clementson characterized Billman's physical capabilities as that of an active adult or athlete with a prosthetic. It also noted that Billman can perform maintenance work and drive a vehicle. The Department found Billman's assessment of his personal limitations to be largely consistent with the work restrictions placed on him by Dr. Ripperda. Given that both experts also opined that Billman is employable, the

Department concluded that Billman failed to establish that he is obviously unemployable.

[¶19.] The Department also concluded that Billman failed to show that he made a reasonable but unsuccessful effort to find employment. The Department defined the scope of Billman's labor market to include the communities of Madison, Brookings, and Sioux Falls and a compensation rate of $11.20 per hour. Thus, the Department found Billman and Audet erred by not including Sioux Falls in their job searches. The Department noted, however, that while Merkwan searched the appropriate markets, she did not apply Billman's self-assessed physical limitations or Dr. Ripperda's restrictions of no going up and down ladders, no squatting or kneeling, and no balancing. The Department ultimately adopted Merkwan's vocational opinion, finding it more persuasive than Audet's. Merkwan found seven jobs in Billman's labor market, although the Department found issues with some of the positions. For example, it found Billman was not trained in the software the CAD drafter position in Sioux Falls required. It found the pizza delivery positions required tasks that are difficult for Billman to perform. Further, it noted that the J&C Transport position was no longer available due to Billman failing to apply in a timely manner. The Department ultimately concluded that Billman's intelligence and adaptability make him capable of employment in his community and that Merkwan found suitable work regularly and continuously available in his labor market.

[¶20.] Billman appealed to the circuit court. It upheld the Department's decision that Billman was not obviously unemployable. The circuit court

determined that although Billman's age is a hinderance, his ability to do light work, his work experience, and his adaptability make him employable. The court also held that the Department's decision that Billman failed to conduct a reasonable job search was not clearly erroneous. Finally, the circuit court concluded that Clarke demonstrated suitable employment in Billman's community, while Billman improperly limited his search both geographically and temporally.

[¶21.]       Billman appeals raising several issues which we restate as follows:

1.       Whether the Department's decision that Billman was not obviously unemployable was clearly erroneous.

2.       Whether the Department's decision that Billman failed to show that he made reasonable efforts to find work and was unsuccessful was clearly erroneous.

**Standard of Review**

[¶22.]       Our standard of review is governed by SDCL 1-26-37, which states, "The Supreme Court shall give the same deference to the findings of fact, conclusions of law, and final judgment of the circuit court as it does to other appeals from the circuit court." When either this Court or the circuit court reviews the underlying findings of the agency, here the Department of Labor, "[t]he Department's factual findings and credibility determinations are reviewed under the clearly erroneous standard." *Wise v. Brooks Constr. Servs.*, 2006 S.D. 80, ¶ 16, 721 N.W.2d 461, 466. These findings will only be reversed "if we are definitely and firmly convinced a mistake has been made." *Id.* "Questions of law are reviewed *de novo*. Mixed questions of law and fact are also fully reviewable." *Kuhle v. Lecy Chiropractic*, 2006 S.D. 16, ¶ 16, 711 N.W.2d 244, 247 (citations omitted). The

burden is ultimately on the claimant to prove all facts essential to compensation. *Id.*

[¶23.]    This Court undertakes the same review of the administrative tribunal's action as the circuit court. *Anderson v. S.D. Ret. Sys.*, 2019 S.D. 11, ¶ 10, 924 N.W.2d 146, 149. "The [C]ourt may affirm the decision of the agency or remand the case for further proceedings. The [C]ourt may *reverse or modify the decision* if substantial rights of the appellant have been prejudiced because the administrative findings . . . or decisions are . . . *[c]learly erroneous in light of the entire evidence in the record*[.]" SDCL 1-26-36 (emphasis added).

## Analysis and Decision

### *Permanent Disability Procedure*

[¶24.]    SDCL 62-4-53 governs whether a person is entitled to odd-lot disability benefits, also known as total and permanent disability benefits. It provides,

> An employee is permanently totally disabled if the employee's physical condition, in combination with the employee's age, training, and experience and the type of work available in the employee's community, cause the employee to be unable to secure anything more than sporadic employment resulting in an insubstantial income. An employee has the burden of proof to make a prima facie showing of permanent total disability. The burden then shifts to the employer to show that some form of suitable work is regularly and continuously available to the employee in the community. The employer may meet this burden by showing that a position is available which is not sporadic employment resulting in an insubstantial income as defined in subdivision 62-4-52(2). An employee shall introduce evidence of a reasonable, good faith work search effort unless the medical or vocational findings show such efforts would be futile. The effort to seek employment is not reasonable if the employee places undue limitations on the kind of work the employee will accept or purposefully leaves the labor market . . . .

SDCL 62-4-53.

[¶25.] This Court recognizes two avenues by which a claimant can meet his or her prima facie showing of entitlement to odd-lot disability benefits—(1) claimant is obviously unemployable due to his or her physical condition, coupled with his or her age, training, and experience,[4] or (2) unavailability of suitable employment by showing that he or she has made reasonable efforts to find work and was unsuccessful. *Eite v. Rapid City Area Sch. Dist. 51-4*, 2007 S.D. 95, ¶ 21, 739 N.W.2d 264, 270-71.

[¶26.] A preliminary issue raised by Billman is whether this Court should review his testimony regarding his physical limitations and the reasonableness of his job search under the de novo standard of review. He suggests that because the Department did not make a credibility determination regarding his testimony on these issues, we should not defer to the Department's assessment of the evidence.

[¶27.] Here, the Department considered both Billman's stated limitations and the work restrictions of Dr. Ripperda when reaching its decision. It stated that Billman's self-professed limitations "are largely consistent with the limitations placed on him by Dr. Ripperda." The Department did not, therefore, discredit Billman's testimony, but rather relied on Dr. Ripperda's assessment of Billman's stated limitations.

---

4. Under the first avenue, the claimant may also show that he or she is obviously unemployable due to being in "the kind of continuous severe and debilitating pain which he [or she] claims." *Eite*, 2007 S.D. 95, ¶ 21, 739 N.W.2d at 271. Although the Department entered a conclusion of law regarding Billman's failure to make this showing, it does not appear that Billman sought benefits on this basis.

[¶28.] In reaching its ultimate determination, the Department weighed the competing testimony from the vocational experts as to how Billman's limitations impacted his employability. "We do not substitute our judgment for the Department's on the *weight of the evidence* or the credibility of witnesses." *Sorensen v. Harbor Bar, LLC*, 2015 S.D. 88, ¶ 19, 871 N.W.2d 851, 856 (emphasis added). Even where specific credibility findings are absent, we defer to the Department's overall assessment of the weight of the evidence when it is based upon live witness testimony. Nevertheless, we still review the Department's factual findings for clear error.

### 1. Whether the Department's decision that Billman was not obviously unemployable was clearly erroneous.

[¶29.] "Whether a claimant makes a prima facie case to establish odd-lot total disability inclusion is a question of fact." *Baier v. Dean Kurtz Constr., Inc.*, 2009 S.D. 7, ¶ 28, 761 N.W.2d 601, 609. "We give great weight to the findings and inferences made by the Department and will only overrule the Department's factual findings if they are clearly erroneous." *Id.* "The test to determine whether a prima facie case has been established is whether there 'are facts in evidence which if unanswered would justify persons of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain.'" *Eite*, 2007 S.D. 95, ¶ 23, 739 N.W.2d at 271 (quoting *Sandner v. Minnehaha Cnty.*, 2002 S.D. 123, ¶ 13, 652 N.W.2d 778, 783).

[¶30.] Under the first avenue for making a prima facie showing of odd-lot disability inclusion, a claimant must show "his physical condition, coupled with his

education, training, and age make it obvious that he is in the odd-lot total disability category[.]" *Id.* ¶ 21, 739 N.W.2d at 270-71. If the claimant shows he or she is obviously unemployable, "the burden of production shifts to the employer to show that some suitable employment within claimant's limitations is actually available in the community." *Id.*

### a. Billman's prima facie showing that he is obviously unemployable.

[¶31.] Billman argues the Department's decision that he is not obviously unemployable is clearly erroneous. He contends that based on the factors in SDCL 62-4-53—physical condition, age, training, and experience—he is obviously unemployable. As he testified and Dr. Ripperda's report states, his *physical condition* makes it impossible for him to lift more than twenty pounds, descend ladders, squat, kneel, balance, and walk on uneven or slippery surfaces. He cannot sit for more than sixty to ninety minutes at a time, or for more than four to five hours per day; and he must stay home four to five days per month to remove his prosthetic. His activities have decreased to five percent of what he formerly performed. Throughout the day, he must adjust his prosthetic to prevent his foot from sliding to a crooked angle. Because of his current condition, he has high cholesterol and hypothyroidism, and an increase in his diabetes symptoms. He now must take insulin shots and occasionally has been taken by ambulance to the emergency room for treatment.

[¶32.] Billman argues the second factor, his *age*, is a further burden on his employability. He is now sixty-four years old and one year away from withdrawing

funds from his retirement account. The Department and both experts acknowledged that his age is a hinderance to employment.

[¶33.] Under the final factor of *training and experience*, Billman argues that, although he is a hard worker, he holds antiquated computer skills, as most employers utilize newer software. The SSA also deems him unemployable, and its search is based on a nationwide job market.

[¶34.] Clarke and Insurer respond that, at the hearing, both vocational experts testified that Billman is employable. They point to the report of Clementson stating that Billman has the capabilities of an active adult or athlete with a prosthetic and assert that Dr. Ripperda's light-duty restrictions show that Billman is employable. They further note that Billman has a history of learning new technology and is currently capable of woodworking, snow blowing, hunting, mowing, and driving a vehicle. Finally, Clarke and Insurer allege that Billman failed to show that his age prevents him from being employed.

[¶35.] In *Shepherd v. Moorman Manufacturing*, the Court examined whether a claimant met his prima facia showing under the odd-lot doctrine. 467 N.W.2d 916, 918 (S.D. 1991). The claimant was forty-five years old, suffered serious back pain, held a high school education, and had a work history of agricultural employment. *Id.* at 917. The claimant did not persuade the Department that his alleged pain placed him in the odd-lot category, and this Court examined the Department's assessment of claimant's testimony under the clearly erroneous standard. *Id.* at 919-20. We held that the employer failed to present evidence to negate the claimant's showing of pain; therefore, the Department's decision that the

claimant failed to establish a prima facie case for odd-lot disability inclusion was clearly erroneous. *Id.* at 920. The claimant's physical condition coupled with his age and experience established a prima facie case for total disability. *Id.*

[¶36.]     Similarly, Billman's testimony about how his age affects his search for employment remains uncontested. In fact, Clarke and Insurer conceded that his age is an issue. Further, at the hearing, Billman presented testimony from both vocational experts that his age hindered his possibility of finding employment. Yet, the Department concluded that "[t]here is no clear evidence that Billman's age has prevented him from finding employment." This determination is clearly erroneous.

[¶37.]     Further, while the Department considered Billman's then age of sixty-two, work history, ability to adapt to new technology, and work restrictions, its conclusion that he is not obviously unemployable is a clear error as it looked at each factor in a silo. The Department must take a holistic approach to a claimant's condition, as each factor affects the severity of the others. The statute explicitly requires the Department to examine the "employee's physical condition, *in combination with* the employee's age, training, and experience[.]" SDCL 62-4-53 (emphasis added).

[¶38.]     The Department determined that Billman's age did not prevent him from finding employment because he can work within light-duty restrictions and can adapt and learn new skills. While Billman's age, physical condition, and training each, on its face, may not inhibit his employment, when analyzed together it becomes clear that Billman met his prima facie showing.

[¶39.] Billman is near retirement, holds antiquated computer skills, is at an eighty-percent permanent partial disability rating, cannot sit or stand for an entire work day, must take four or five days off each month, and is incapable of living alone. Outside of physically accommodating Billman, an employer would likely have to spend time and resources to train him—a person set to retire in a few years. Common sense dictates that a reasonable employer would forgo investing resources in a soon-to-be retiree and instead search for an individual who either holds the necessary skills or is closer to the beginning of his or her career. Further, although "not binding on this Court[,]" we find persuasive the SSA's disability determination that Billman was unable to locate available employment. *Vilhauer v. Dixie Bake Shop*, 453 N.W.2d 842, 846 (S.D. 1990).

[¶40.] This Court has repeatedly upheld decisions that hold individuals in similar situations to be obviously unemployable. *See Baier*, 2009 S.D. 7, 761 N.W.2d 601 (upholding Department's decision that employee who was forty-eight years old, held no formal education, and needed training was obviously unemployable); *Kassube v. Dakota Logging*, 2005 S.D. 102, 705 N.W.2d 461 (upholding Department's decision that employee who was forty-two years old and was unable to return to former occupation was obviously unemployable); *but cf. Petersen v. Hinky Dinky*, 515 N.W.2d 226 (S.D. 1994) (deeming claimant *not* obviously unemployable who was twenty-nine years old and capable of retraining).

[¶41.] The Department failed to examine Billman's situation in the aggregate. We are firmly convinced that the Department erred as Billman met his prima facie showing. The Department's decision is clearly erroneous.

    b.  *Clarke and Insurer's burden of showing that suitable*
       *employment is available.*

[¶42.]   As Billman met his prima facie showing that he is obviously unemployable, the burden of production shifted to Clarke and Insurer to show that suitable employment within Billman's limitations is available in his community. A claimant who has shown that he is obviously unemployable does not bear the additional burden of demonstrating "that he made reasonable efforts to find employment in the competitive market" before the burden shifts to the employer. *Kassube*, 2005 S.D. 102, ¶ 34, 705 N.W.2d at 468.

[¶43.]   "While it is not required that an employer actually place a claimant in an open job position, more than the mere possibility of employment must be shown; the employer must establish that there are positions actually open and available." *Johnson v. Powder River Transp.*, 2002 S.D. 23, ¶ 21, 640 N.W.2d 739, 744. "The employer may meet this burden by showing that a position is available which is not sporadic employment resulting in an insubstantial income as defined in subdivision 62-4-52(2)." SDCL 62-4-53. Sporadic employment is "employment that does not offer an employee the opportunity to work either full-time or part-time and pay[s] wages equivalent to, or greater than, the workers' compensation benefit rate applicable to the employee at the time of the employee's injury." SDCL 62-4-52. The work must be available in the claimant's community, which is "the area within sixty road miles of the employee's residence unless: (a) [t]he employee is physically limited to travel within a lesser distance; [or] (b) [c]onsideration of the wages available within sixty road miles and the cost of commuting . . . makes it financially infeasible to work within such a distance[.]" *Id.*

[¶44.]    Billman argues that Clarke failed to show "'specific' positions [are] 'regularly and continuously available' and 'actually open'" in his community. *Shepherd*, 467 N.W.2d at 920. He further contends that Merkwan's analysis failed to consider his physical limitations, beyond Dr. Ripperda's work restrictions; and she did not analyze whether Billman is financially and physically capable of commuting to Sioux Falls on a daily basis. Additionally, he advances that only five of Clarke's positions were within sixty miles of Volga and paid above his workers' compensation rate, and each of these positions was unavailable or failed to accommodate his physical limitations.[5]

[¶45.]    Clarke and Insurer respond that they presented available positions including a hotel front desk receptionist in Brookings and a CAD drafter in Sioux Falls who offered training. Billman, they note, also applied late to a drafting position identified by Merkwan. They advance that he has a solid work history, experience adapting to new technology, and a high level of education. They argue that Merkwan did not have to consider Billman's testimony on his physical limitations because she considered Dr. Ripperda's restrictions.

[¶46.]    To determine available jobs, the Department found Billman resided in the Volga area making the labor markets of Brookings, Madison, and Sioux Falls

---

5.    Billman also questions the credentials of Merkwan as she is not a certified vocational rehabilitation consultant, does not hold a master's degree in rehabilitation counseling, and has little training in vocational rehabilitation. The Department's decision did incorrectly state that Merkwan holds "an M.S. in Rehabilitation Counseling" and is "certified in South Dakota." However, Merkwan did accurately present her credentials at the hearing. We deem it unnecessary to analyze the effects of these errors as we reverse on other grounds.

within his community. As such, the Department deemed Audet's and Billman's job searches unreasonable as they did not search the labor market of Sioux Falls.[6]

[¶47.]    However, the Department and Merkwan both overlook subsections (1)(a) and (1)(b) of SDCL 62-4-52, which permits the Department to shrink a claimant's sixty-mile radius due to his or her physical limitations, or the wages available compared to the costs of commuting. While stating that "Billman's work-related injury does not render him incapable of traveling to Sioux Falls for employment[,]" the Department's and circuit court's determinations are devoid of analysis on the physical and financial costs Billman would incur if required to make a daily 108-mile commute. Physically, Billman can operate a vehicle; however, the ability to operate a vehicle does not make one capable of a *daily* two-hour commute. In particular, in a state like ours that has precarious weather conditions for six months out of the year, such a commute is not feasible for a person who is operating a vehicle with one leg on potentially icy roads at night. Further, neither the Department nor the circuit court factored in the financial costs of a daily 108-mile commute. Billman's workers' compensation benefit rate is $11.20 per hour and the *highest* compensation Merkwan was able to locate in Sioux Falls was $18 per hour. The Department should have examined the financial feasibility of a daily 108-mile

---

6.    Although the Department found Billman did not make a prima facie showing that he was either obviously unemployable or that he made a reasonable job search, it continued to analyze whether Clarke met its burden of production to show some form of suitable work is regularly and continuously available to Billman.

commute in comparison to the available wages.[7] Moreover, the Department overlooked the fact that Billman can only sit a combined total of four to five hours per day. If he spent two hours per day commuting, he could only work from a seated position for up to three additional hours per day. Under these circumstances, it was a clear error to include Sioux Falls in Billman's labor market without any analysis. *Compare Johnson,* 2002 S.D. 23, ¶ 25, 640 N.W.2d at 745 (holding Department did not err by analyzing the cost of commuting when determining if employer located adequate employment within claimant's community) *with Sandner,* 2002 S.D. 123, ¶ 25, 652 N.W.2d at 785 (rejecting the limiting of claimant's community when claimant had been commuting from Canistota to Sioux Falls for many years despite physical limitations).

[¶48.] We further question the adequacy of the number of positions Clarke and Insurer identified. The five positions presented by Clarke, which met statutory requirements, included: a dispatcher position at J&C Transport in Madison for $15-18 per hour, a hotel desk receptionist position at DenWil Hospitality Group in Brookings for $12 per hour, a full time architectural technician at Mills Construction in Brookings, and a dispatcher position at Express Pros Staffing in Brookings for $13 per hour. There are several issues with these positions. The J&C Transport position was no longer available due to a downturn in business; Merkwan did not contact the DenWil Hospitality Group to confirm that Billman could

---

7. Based on South Dakota's employee reimbursement rate of $0.42 per mile, the cost of commuting 108 miles per day on a weekly basis is roughly $226 per week. Bureau of Hum. Res., Travel Rates (2020), https://bhr.sd.gov/files/travelrates.pdf.

physically perform the job; and Billman was unqualified for the Mills Construction position as it was for an architectural, not a manufacturing, engineer. Clarke's and Insurer's available positions are thus reduced to one dispatcher position, which may be outside Billman's physical limitations. Although Clarke and Insurer do not need to place Billman in a job, they need to show more than the "mere possibility of employment." *Capital Motors, LLC v. Schied*, 2003 S.D. 33, ¶ 12, 660 N.W.2d 242, 247 (upholding Department's finding that employer failed to show suitable employment available because it identified only two positions and claimant was not qualified for one position and the other may have paid below his workers' compensation rate); *see also Spitzack v. Berg Corp.*, 532 N.W.2d 72, 76 (S.D. 1995) (circuit court overturned Department's finding that employer found suitable employment because employer only found one position which was not suitable for claimant's limitations).

[¶49.]     Finally, as this Court has stated,

> An expert's listing of jobs that focuses on a claimant's capabilities to the exclusion of his limitations is insufficient as a matter of law. When prospective employers were not informed of the nature of the limitations they needed to accommodate, there was no basis for the expert's opinion in concluding that the employers were willing to make modifications to meet those limitations.

*Eite*, 2007 S.D. 95, ¶ 28, 739 N.W.2d at 273. Based on the above rationale, the Court in *Eite* held the Department's conclusion that the employer found suitable employment was an error of law. *Id.* The employer identified fourteen prospective employers who stated they would be willing to accommodate the claimant's needs. *Id.* ¶ 26, 739 N.W.2d at 273. However, the former employer failed to inform the

prospective employers of the claimant's age, training capabilities, and need to physically switch positions every forty-five minutes. *Id.*; *see also Kurtz v. SCI*, 1998 S.D. 37, ¶ 21, 576 N.W.2d 878, 885 (employer must show positions available for a person with *all* claimant's limitations); *Enger v. FMC*, 1997 S.D. 70, ¶ 25, 565 N.W.2d 79, 86 (holding employer failed to show suitable employment available because claimant was unable to perform the listed jobs or listed jobs required prospective employer to make a special accommodation). Clarke's search contained the same fatal error.

[¶50.] Here, the Department did not discredit Billman's stated limitations and instead found them consistent with Dr. Ripperda's light-duty work restrictions. It specifically found, "Billman cannot safely walk on uneven surfaces such as an acreage, grass, or yard" and has issues traversing stairs. Additionally, it acknowledged that Billman must adjust his stump throughout the day, cannot sit or stand for eight hours a day, and must alternate between the two.[8] While the record reflects that Merkwan contacted most employers, she committed an error by disregarding Billman's limitations and only discussing his capabilities. Merkwan testified that, in conversations with potential employers, she only mentioned Billman's limitations of lifting no more than twenty pounds and Dr. Ripperda's light-duty restrictions. The Department acknowledged that, "Merkwan did not apply the entire list of restrictions assigned by Dr. Ripperda." "The restrictions not included in Merkwan's analysis are no up and down ladders, no squatting or

---

8.     Merkwan testified that she understands that Billman needs to sit four to five hours a day, as it is consistent with his injury. Yet, she failed to mention this limitation to the employers she contacted.

kneeling, and no balancing with left leg." Even more problematic is the fact that, in creating her job report, Merkwan failed to discuss with each employer Billman's inability to traverse stairs, balance, and alternate between sitting and standing. Merkwan, like the employer in *Eite*, focused instead on Billman's abilities, while disregarding his limitations. This, as we have stated, is an error of law.

[¶51.]        In summary, Clarke and Insurer failed to meet their burden of producing evidence showing that suitable employment is regularly and continuously available for individuals with Billman's limitations in his community. Based on the record, we are firmly convinced the Department's factual finding that Billman is *not* obviously unemployable is clearly erroneous. Further, the Department made errors of law in determining that Clarke and Insurer presented suitable employment. Because Billman established that he is obviously unemployable, and Clarke and Insurer failed to identify available suitable employment, we conclude Billman is entitled to odd-lot disability benefits.

> **2.      *Whether the Department's decision that Billman failed to show that he made reasonable efforts to find work and was unsuccessful was clearly erroneous.***

[¶52.]        If a claimant fails to show that his or her impairment is so limited that he or she is not obviously unemployable, the second avenue for making a prima facie showing that he or she is permanently and totally disabled, provides:

> [T]he burden remains with the claimant to demonstrate the unavailability of suitable employment by showing that he has made reasonable efforts to find work and was unsuccessful. If the claimant makes a prima facie showing based on the second avenue of recovery, the burden shifts to the employer to show that some form of suitable work is regularly and continuously available to the claimant. Even though the burden of production

> may shift to the employer, however, the ultimate burden of persuasion remains with the claimant.

*Eite*, 2007 S.D. 95, ¶ 21, 739 N.W.2d at 271. Because we conclude Billman established that he is obviously unemployable under the first avenue, it is unnecessary to reach the reasonableness of his job search.

### Conclusion

[¶53.]     The Department's determination that Billman is not obviously unemployable is clearly erroneous. Therefore, we reverse the Department's order and remand for entry of judgment consistent with this opinion.

[¶54.]     JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.

[¶55.]     MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.