#30494, #30542-aff in pt & rev in pt-SPM
**2024 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MICHAEL ARNESON,                                      Claimant and Appellant,

    v.

GR MANAGEMENT, LLC, d/b/a
MINERAL PALACE CASINO,                               Employer and Appellee,

    And

RISK ADMINISTRATION SERVICES, INC.         Insurer and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHRISTINA L. KLINGER
Judge

* * * *

BRAD J. LEE of
Beardsley, Jensen, & Lee, Prof. LLC
Rapid City, South Dakota                  Attorneys for claimant
                                          and appellant.


CHARLES A. LARSON
KRISTIN N. DERENGE of
Boyce Law Firm
Sioux Falls, South Dakota                 Attorneys for appellees
                                          Employer and Insurer.

* * * *

ARGUED
JUNE 5, 2024
OPINION FILED **10/16/24**

#30494, #30542

MYREN, Justice

[¶1.]        Michael Arneson suffered an electric shock while working for GR Management, LLC d/b/a Mineral Palace Casino (Employer).  Arneson claimed the electric shock caused two conditions–atrial fibrillation and numbness in his right hand.  Employer and its Insurer, Risk Administration Services, Inc., paid benefits for Arneson's medical treatment immediately following the injury but denied his claim for additional benefits for conditions they deemed were not caused by the electric shock.  The Department of Labor determined the electric shock was a major contributing cause of both of Arneson's conditions and that he was permanently and totally disabled under the odd-lot category.[1]

[¶2.]        Employer/Insurer appealed to the circuit court, which determined that the electric shock was a major contributing cause of Arneson's hand condition but not his heart condition.  The circuit court also determined that Arneson was not permanently and totally disabled.  Arneson appealed, and Employer/Insurer filed a notice of review.  We affirm in part and reverse in part.

### Factual and Procedural Background

[¶3.]        Arneson was born on August 24, 1955.  He did not graduate from high school but later obtained his GED.  He served in the United States Navy and was honorably discharged.  He later attended courses about electrical systems,

---

1.    "The odd-lot doctrine 'permits a finding of total disability for an injured claimant who, though able to work sporadically, cannot obtain regular employment and steady income and is thus considered an "odd lot" in the labor market.'"  *Lagler v. Menard, Inc.*, 2018 S.D. 53, ¶ 14 n.4, 915 N.W.2d 707, 713 n.4 (quoting *Odd-lot doctrine, Black's Law Dictionary* (10th ed. 2014)).

plumbing, machine operation, and swimming pool systems. He received OSHA training and obtained several professional certifications. Arneson also earned an associate degree in finance.

[¶4.]     Arneson has had several jobs, mostly in repair and maintenance. From 1974 to 1989, Arneson was a machine operator and parts technician; from 1989 to 1991, he was an over-the-road truck driver; from 1991 to 2006, he had his own auto repair business; from 2006 to 2014, Arneson was head of maintenance and cleaning of machinery; and from 2014 to 2015, he was a maintenance manager. In 2015, he began working as the maintenance manager for Employer, a hotel and casino located in Deadwood, South Dakota, where his duties included overseeing maintenance personnel, cleaners, and valet; painting, tiling, carpentry, snow removal, lawn care, and miscellaneous cleaning; servicing exhaust units, A/C units, and kitchen equipment; and monitoring the plumbing and electrical units. Arneson described his job with the Employer as "heavy duty," requiring him to lift and carry up to 50 pounds, climb ladders, and frequently walk from one end of the hotel/casino to the other.

[¶5.]     On July 18, 2018, while working for Employer, Arneson suffered an electric shock injury when a commercial exhaust fan shorted, sending 300 amperes and 440 volts of electricity into his right hand, exiting his left foot. Arneson went to the emergency room at the Lead-Deadwood Hospital, where he was diagnosed with burns to four fingers of his right hand. At that time, Arneson's heart rate was regular, an electrocardiogram was normal, and he reported no heart palpitations. Arneson was discharged from the emergency room that same day and provided with

an informational sheet that explained that a "strong electric shock (*high voltage*) can harm the heart, muscles, and brain," that "just 50 volts of electricity may be enough to disrupt the heart's rhythm," and that symptoms of electric shock injury included tingling and numbness, skin burns, chest pain, and very fast or irregular heartbeat (palpitations).

[¶6.] Within a day or two, Arneson began experiencing mild heart palpitations, which continued over the next several days. The palpitations did not concern Arneson until July 30, 2018, when he experienced a fast heart rate while working. Arneson returned to the emergency room, where he presented with chest pain, dizziness, and heart palpitations. His heart rate was 195 beats per minute, and his blood pressure was low (76/48). Arneson was admitted to the hospital and diagnosed with atrial fibrillation (AFib) (irregular heart rhythm) and hyperthyroidism, neither of which had been previously diagnosed. Arneson reported that the middle three fingers of his right hand were still numb.

[¶7.] While hospitalized, Arneson was examined by Dr. Holloway, who noted: "The patient presents with no prior cardiac or endocrine history with acute onset of paroxysmal atrial fibrillation in the setting of hyperthyroidism, currently of unknown etiology." Dr. Holloway also contemporaneously noted:

> [Arneson] asked whether the hyperthyroidism and episode of atrial fibrillation could be related to his recent electrical injury. The electric shock wave clearly passed through his heart, as the entry point was his right hand and the exit point was his left foot. Electric shocks like this can lead to electrical instability of the heart [and] persist for some time beyond the shock itself, even if the shock itself was not immediately associated with the development of arrhythmias. Therefore, I believe we must consider his atrial fibrillation as [ ] work-related, having been either triggered or significantly exacerbated by the electric

shock.  I do not believe his hyperthyroidism was related to electrical injury, however.

Arneson was discharged from the hospital the following day.

[¶8.]        In a letter following Arneson's discharge, Dr. Holloway informed

Arneson:

> Your echocardiogram shows normal dimensions of each of your heart chambers, normal pumping and relaxation function of your heart muscle, and normal [s]tructure and function of your heart valves.  This is encouraging and suggests that you will be able to maintain a normal heart rhythm, once we control your hyperthyroidism.

After additional testing, Arneson was diagnosed with Graves' disease.[2]

[¶9.]        In a note after Arneson's office visit in April 2019, Dr. Holloway stated:

> [Arneson] asked me to render a judgment regarding how much of his current medical condition is related to the electrical shock. His neurologic symptoms, namely numbness of the right index, long and fourth finger, are clearly related to nerve damage from the electrical shock.  It is possible that these will resolve over time, but it could take up to 2 years, and may not resolve at all. He does have some residual disability from this.  The numbness interferes with his activities to the extent that he is clumsy when using his hand.  He is right-handed.  He drops things easily.  This latter problem [sic] prior to the injury.  Paroxysmal atrial fibrillation is, in my judgment, also related to this electrical shock injury.  It caused electrical instability of the heart, which can persist for an extended time afterwards. Unfortunately, once a person has developed paroxysmal atrial fibrillation from a triggering cause, they are still prone to have episodes of this at a later date, long after the injury.  His hyperthyroidism was not caused by the electrical injury. However, this condition was aggravated by electrical injury, to the extent that the latter was responsible for the development of paroxysmal atrial fibrillation.  Although atrial fibrillation can be

---

2.    "Graves' disease is an autoimmune disorder that can cause hyperthyroidism, or overactive thyroid."  *See Graves' Disease*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, https://www.niddk.nih.gov/health-information/endocrine-diseases/graves-disease (last visited Oct. 9, 2024).

seen in patients who are hyperthyroid, due to thyroid overactivity, he did not have fibrillation prior to the electrical shock and I think it is probable (greater than 50%) that, absent electrical shock, his thyroid condition would not have triggered atrial fibrillation.

[¶10.] Arneson continued to have numbness in the fingers of his right hand, which made it difficult for him to pick up and hold items with that hand. He continued to have heart palpitations, which required him to rest throughout the day. Arneson worked for Employer for approximately ten months after the injury, without work restrictions. He "retired" in 2019 because it was difficult for him to lift and move things, he could not walk across the hotel/casino without taking a break, and he had to rely on his coworkers to assist him due to his decreased strength and stamina.[3] He has not worked anywhere since then, but he has been able to drive his motorcycle and perform mechanical work on vehicles and motorcycles.

[¶11.] Arneson claimed that he was unable to work because of the work injury and made a claim for workers' compensation disability benefits. The insurer determined that the electric shock was not a major contributing cause of his ongoing conditions and denied medical bills incurred after July 20, 2018. Arneson filed a petition for hearing with the Department on June 28, 2019. The Department heard the case on September 14, 2022, and some of the evidence included testimony from:

- Arneson, who testified in person;
- Dr. Holloway, Arneson's medical expert, whose testimony was presented via deposition transcript;

---

3. Arneson stated he "retired" but explained that he resigned because he no longer felt he could perform his job duties.

- Dr. Elkins, Employer/Insurer's medical expert, who testified in person;
- Dr. Brody, Employer/Insurer's medical expert, whose testimony was presented by deposition transcript;
- Tom Audet, Arneson's vocational expert, who testified in person; and
- James Carroll, Employer/Insurer's vocational expert, who testified in person.

[¶12.]     The Department issued its decision on March 21, 2023, and concluded Arneson proved that the electric shock was a major contributing cause of both his heart and hand conditions and that he is permanently and totally disabled under the odd-lot category. The Department awarded him past benefits from February 3, 2020, as well as ongoing medical and disability benefits.[4]

[¶13.]     Employer/Insurer appealed the Department's decision to the circuit court, which issued a memorandum opinion partially reversing the Department's decision. The circuit court determined the electric shock was a major contributing cause of Arneson's hand injury but was not a major contributing cause of his heart condition. The circuit court also determined Arneson was not permanently and totally disabled.

[¶14.]     Arneson raised two issues on appeal, and Employer/Insurer raised one. The three issues we consider are:

> 1.     Whether the Department erred in concluding that Arneson proved his workplace injury was a major contributing cause of his heart condition.

---

4.     The Department concluded, "Arneson has not proven that he was permanently and totally disabled between the time he chose to leave his employment and when Dr. Holloway signed off on the restrictions. Therefore, any benefits he is entitled to regarding past permanent and total disability benefits will not include the time between June 1, 2019, and February 3, 2020."

2.  Whether the Department erred in determining Arneson proved his workplace injury was a major contributing cause of his hand condition.
3.  Whether the Department erred in determining Arneson proved he was permanently and totally disabled and entitled to benefits under the odd-lot category.

## Standards of Review

[¶15.]    "'We review the Department's decision in the same manner as the circuit court.'" *News Am. Mktg. v. Schoon*, 2022 S.D. 79, ¶ 18, 984 N.W.2d 127, 133 (citations omitted).  "'The Department's conclusions of law are fully reviewable.'" *Id.* at 133–34 (citation omitted).  "We review the Department's findings of fact for clear error and overturn them only if 'after reviewing the evidence we are left with a definite and firm conviction that a mistake has been made.'" *Id.* at 133 (citations omitted).  However, "'[w]e review the Department's factual determinations based on documentary evidence, such as depositions and medical records, de novo.'" *Id.* (citations omitted).

## Decision

[¶16.]    "In a workers' compensation dispute, a claimant must prove all elements necessary to qualify for compensation by a preponderance of the evidence." *Darling v. W. River Masonry, Inc.*, 2010 S.D. 4, ¶ 11, 777 N.W.2d 363, 367 (citation omitted).  Sustaining a work-related injury does not automatically establish entitlement to benefits for the claimed condition; instead, the claimant must prove that the work-related injury is *a* major contributing cause of his claimed condition and need for treatment.  *See id.*  The claimant does not have to prove the work

injury was *the* major contributing cause. *See Brown v. Douglas Sch. Dist.*, 2002 S.D. 92, ¶ 23, 650 N.W.2d 264, 271 (citing SDCL 62-1-1(7)).

[¶17.] Causation must be established to a reasonable degree of medical probability, not just possibility. The evidence must not be speculative but must be "'precise and well supported.'" *Darling*, 2010 S.D. 4, ¶ 12, 777 N.W.2d at 367 (citation omitted). "The testimony of medical professionals is crucial in establishing the causal relationship between the work-related injury and the current claimed condition 'because the field is one in which laypersons ordinarily are unqualified to express an opinion.'" *Id.* ¶ 13 (citations omitted).

### 1. *Whether the Department erred in concluding that Arneson proved his workplace injury was a major contributing cause of his heart condition.*

[¶18.] Arneson claims the circuit court erred in reversing the Department's determination that he established the electric shock was a major contributing cause of his heart condition. Arneson contends the Department's determination that the electrocution was a major contributing cause of his heart condition is supported by the expert testimony in this record. In determining that Arneson sustained his burden, the Department found Dr. Holloway's opinions on causation more persuasive than the opinions of Drs. Brody and Elkins. The circuit court, however, was persuaded by the opinions of Dr. Brody and Dr. Elkins.

### *Dr. Holloway's background and medical opinions*

[¶19.] Dr. Holloway did not testify live; consequently, "we do not apply the clearly erroneous rule but review that testimony as though presented here for the first time." *Day v. John Morrell & Co.*, 490 N.W.2d 720, 723 (S.D. 1992). Dr.

Holloway is an internist who regularly treats patients with both cardiac and thyroid issues. According to Dr. Holloway, internists address medical problems in adults, including conditions related to cardiology, which he has been "treating fairly consistently for the past almost 30 years." He previously treated patients who have been electrocuted, including two or three "serious" cases. As Arneson's treating physician, Dr. Holloway examined Arneson on several occasions, including the day of the electric shock.

[¶20.] Dr. Holloway explained how an electric shock can generally cause damage to the body:

> Well, any time there is a passage of an electrical current, you know, through the body, you can get damage to the cells through which the current passes. In the case of a burn on the hand, it's physically obvious. You look at it and you see a burn. Internal injuries are not always as obvious. The ones we see most commonly that manifest with symptoms are heart injuries because of the fact that the heart is, basically, an electrical organ as well as a muscular organ. Electrical circuits within the heart regulate the rhythm. They can be disrupted directly by the electrical current. And because the cells can be damaged by the electrical current, there are often long-term lasting effects in that people will have -- you know, harbor disturbances after such an injury.

[¶21.] Specific to Arneson's heart issue, Dr. Holloway explained:

> In this case we had a patient who presented with atrial fibrillation a short time after having had a significant electrical injury. He had some minor palpitations apparently prior to presenting to the emergency room and sustained atrial fibrillation. It is very common for people after an electrical injury to have rhythm disturbances. Generally what happens is you have an excessive number of what are called premature atrial contractions. These contractions, if they happen to occur at the right time, can trigger sustained rhythm disturbances. Sometimes those rhythm disturbances will last for a few seconds. Sometimes they will last for a few minutes. It's very common for people who have -- who developed sustained atrial

fibrillation, as he did, to initially have some brief transient palpitations that they don't think much of and ignore. But then they come in with a full-blown atrial fibrillation episode.

Dr. Holloway noted the majority of people with hyperthyroidism do not develop atrial fibrillation. He reasoned:

If he had just come to your office and never had an electrical injury and happened to have the two together, you could link it as an association. But, again, only about 10 percent of people with hyperthyroidism develop atrial fibrillation. He had an electrical shock which we know causes electrical instability, palpitations, extra beats, which can trigger atrial fibrillation. However, only about 10 percent, range 5 to 15 percent of patients with hyperthyroidism will develop atrial fibrillation. So that's, basically, the relationship between hyperthyroidism and atrial fibrillation.

In Dr. Holloway's opinion, "absent the electrical shock, it is more likely than not that he would not have had atrial fibrillation."

[¶22.] Dr. Holloway explained Arneson's heart condition would not necessarily get better over time because "unfortunately, once you have an electrical injury, the predisposition to arrhythmias may persist for a long time and sometimes permanently if there's damage to the electrical system of the heart that regulates rhythm." When asked, "[w]ould you agree that the hyperthyroidism is also causing the AFib," Dr. Holloway stated:

It's a predisposing factor. I'm reluctant to attribute any direct causality to the hyperthyroidism because, like I said, the majority of patients with hyperthyroidism did not develop atrial fibrillation, but clearly it's a predisposing factor.

[¶23.] Dr. Holloway testified, "the effect of an electrical injury on the heart can persist for a long time afterwards. . . . If someone asked me [sic] I had an electric shock a year ago and then an atrial fibrillation, is there a connection? I

would probably say no. But weeks to a few months afterwards, I would probably attribute the arrhythmia at least in large part to the shock." Dr. Holloway stated, "even smaller shocks can cause disruption of the electrical circuitry in the heart for a sustained period of time."

### *Dr. Brody's background and medical opinions*

[¶24.]        Dr. Brody's testimony was presented by deposition; thus, we review it as though it were presented here for the first time. *Id.* Dr. Brody has been a cardiologist since 1989 and currently practices in St. Paul, Minnesota. He reported substantial experience treating cardiac patients and sees patients with AFib "[p]retty much every day." Dr. Brody has treated patients who also have hyperthyroidism, but he has never "treated anybody for their thyroid problem specifically." Instead, he would refer a patient with thyroid issues to an internist or endocrinologist. He testified that he has only "very, very, very, infrequently" treated a patient who was exposed to electric shock. He also performs independent medical examinations (IMEs) and performs records reviews. Dr. Brody did not examine Arneson; his opinions were based entirely on his review of Arneson's medical records and medical literature.

[¶25.]        Based on the medical literature Dr. Brody reviewed, he concluded that the electric shock was not a major contributing cause of Arneson's atrial fibrillation. He explained in his report:

> Atrial fibrillation has been described only very rarely after an electrical shock. Based on review of the literature, there appeared to be a few handful (three or four) of case reports dating back to 1954. There are no case reports describing electrocution-induced atrial fibrillation that occurred 12 days

after an electrical injury.  Mr. Arneson's atrial fibrillation was likely secondary to hyperthyroidism.

But Dr. Brody qualified that statement at his deposition, where he explained:

> Now, I will change it a little bit.  I redid the literature report a couple of days ago, and there actually is one case that's in a journal that reported a person that actually got a low energy shock and then -- let's see -- sometime thereafter developed atrial fib.  But even in that particular article they kind of report the case, but they do say in that particular report that it might be related, but they didn't really comment on whether it was caused by the electrical shock.
>
> . . .
>
> There is a -- they commented in this article that they thought the prevalence of atrial fibrillation after an electrical shock was .6 percent.  And one of the articles they cited -- it sounded like all the cases that were cited, they had -- the cases had atrial fibrillation at the time of the electrical shock that resolved within 24 hours, so . . .

[¶26.]     Dr. Brody's opinion that the AFib "was likely secondary to hyperthyroidism" was "based on experience and also literature review."  He stated, "that association is a lot stronger than the association with electrical shock and atrial fibrillation."

[¶27.]     When asked whether he expected to see irregular heart rhythms at the time of the electric shock or soon after that, Dr. Brody answered, "[c]ould have.  Not necessarily, but he could have."  Dr. Brody was asked: "Would the fact that Mr. Arneson was experiencing heart palpitations in the days following the electrical shock make it more likely that the shock was the cause of his atrial fibrillation that he entered into on July 30th?"  He responded: "I don't know.  It would depend on how he described it and what day it was.  When you say days before, it could have been July 19th, but it could have been July 29th also, so it would depend on when

and what he was actually feeling at the time." Dr. Brody testified that if Arneson was feeling heart palpitations the day after the electric shock, "it might possibly make me think that there might have been a relationship between the shock and what he was feeling in between. However, the fact that he has hyperthyroidism might make me think that it's not that close -- that the two weren't so closely related." Dr. Brody also thought it "possible" that the "stress of the electrocution on top of [the Graves' disease] might have triggered something."

[¶28.]      Dr. Brody also could not rule out the possibility that the electricity may have gone through Arneson's heart when it entered through his hand and exited through his foot. He acknowledged that even though there was no evidence of structural damage to Arneson's heart, the electricity could have gone through the heart.

[¶29.]      When asked whether AFib after an electric shock can happen, Dr. Brody responded: "Yeah. It's been reported it happens. Oh, it does happen." Dr. Brody agreed that "low-voltage electrocution may cause cardiac insult" and it "can cause myocardial necrosis with ventricle fibrillation and also arrhythmias." Dr. Brody agreed that in one case reported in the literature, a patient subjected to "low voltage of 220 to 240 volts" developed atrial fibrillation six weeks after the electrocution occurred.

[¶30.]      Dr. Brody also agreed with Dr. Holloway's statement that it is "very common for people after an electrical injury to have rhythm disturbances" and explained the reasons for it:

> [I]t's just something that's observed. You know, people can get heart damage, the stress of the injury, it can trigger skipped

> heartbeats. You know, if somebody gets some damage to the heart muscle, that can trigger dangerous abnormal heart rhythms. And as we pointed out, atrial fib has been reported after an electrical injury.

He also explained, "[i]t's possible that a person could have short bursts of atrial fib and then have sustained atrial fib. It's possible that a person could have some palpitations due to some skipped heartbeats that aren't atrial fib and then they come in with atrial fib. Atrial fib, at least from a cardiologist's standpoint, it's so common that anything can happen." Dr. Brody was not aware of any event between the time of the electric shock on July 18 and when Arneson presented to the ER on July 30 that would cause him to go into AFib, or that would cause the hyperthyroidism to become symptomatic.

### *Dr. Elkins' background and medical opinions*

[¶31.]     Dr. Elkins testified in person before the Department. Consequently, any credibility determinations the Department made with respect to his testimony are entitled to deferential review using the clearly erroneous standard. *Billman v. Clarke Mach., Inc.*, 2021 S.D. 18, ¶ 22, 956 N.W.2d 812, 819. Dr. Elkins is an occupational medicine physician who treats injured workers and conducts employment-related physicals. Dr. Elkins works part-time for the VA as an employee health physician who also does IMEs and records reviews. He currently does not provide any treatment to patients. Although he had some exposure to cardiac patients during his family practice training, Dr. Elkins does not treat cardiac or thyroid patients as part of his practice and is not an expert in treating patients with cardiac or thyroid issues.

[¶32.]     In addition to a records review, Dr. Elkins examined and interviewed Arneson. He indicated that he found Arneson to be forthcoming and credible. Dr. Elkins found Arneson had no damage to his heart after the electric shock and had no cardiac symptoms the day of or two days after the electric shock. Dr. Elkins testified that the medication Arneson took for his hyperthyroidism seemed to help the AFib and that when he stopped his medication, he would be symptomatic.

[¶33.]     Dr. Elkins opined that there is a low likelihood that a low-voltage injury would create long-term complications. He testified that after an electrical shock, a person would experience heart issues within the first few hours. If there were no heart issues after 12 or 24 hours, they are "not likely to have experienced damage to the heart from the electricity." Dr. Elkins testified:

> Atrial fibrillation would be an uncommon rhythm from an electrical injury no matter how far out you're looking. There really just aren't -- there haven't been enough cases of delayed electrical fibrillation to really have any idea. You know, when they do these studies and they follow people up for a few weeks or a few months or however long they follow them, they just -- they don't, you know, find that.

He testified it is more likely to develop AFib from hyperthyroidism than from electric shock. Dr. Elkins admitted that just 50 volts of electricity may be enough to disrupt the heart's rhythm, and 600 volts could cause serious damage to the body. He also acknowledged that all of Arneson's symptoms are signs of someone with an electrical shock injury and that a low-voltage electric shock can cause atrial fibrillation. He also agreed it is "common for people who have developed sustained atrial fibrillation to initially have some brief transient palpitations that they don't

think much of and ignore but then they come in with a full-blown atrial fibrillation episode."

*Consideration of the conflicting expert opinions*

[¶34.]     In Dr. Holloway's opinion, the electric shock was a major contributing cause of Arneson's heart condition. He based that opinion in part on the fact that following an electric shock, the most common injuries are to the heart because it is an electrical organ, and there can be "long-term lasting effects" from an electric shock. Because of that, it is "very common for people after an electrical injury to have rhythm disturbances." Dr. Holloway also took the timing of the heart palpitations and AFib into account, noting that within days of the electric shock, Arneson began having rhythm disturbances, which can trigger sustained rhythm disturbances. Dr. Holloway became Arneson's treating physician shortly after the electrocution and was fully aware of his medical history. His opinions regarding the causation of Arneson's conditions are made more persuasive by the knowledge he gained as Arneson's treating physician and his experience treating patients with cardiac problems and electrocution.

[¶35.]     Drs. Brody and Elkins both attribute Arneson's heart condition to hyperthyroidism, which they admit was undiagnosed and asymptomatic prior to the electric injury. They concluded that it was statistically more likely that Arneson's AFib was the result of hyperthyroidism rather than electric shock. This was based on the fact that the medical literature they reviewed showed few examples of AFib resulting from electrical shock and many examples where AFib was the result of hyperthyroidism. An opinion based solely on statistical improbability ignores the

fact that, by definition, improbable events do occur. *See Ingram v. Syverson*, 674 N.W.2d 233, 237 (Minn. Ct. App. 2004) (noting "medicine is an imperfect science and a plaintiff's symptoms may not always be proven by tests and statistics.").

[¶36.]     Based on those statistics, Dr. Brody opined that developing AFib from an electric shock was "uncommon." However, that opinion is at odds with his agreement that it is "very common for people after an electrical injury to have rhythm disturbances." Dr. Brody concluded that Arneson had "a normal EKG immediately after the electrocution, which indicated that there was no evidence that the shock of July 18th caused any structural heart disease that triggered the atrial fibrillation." Dr. Brody recognized, however, that the electricity could have gone through Arneson's heart without structural damage and that an irregular rhythm would not necessarily be present right after the electric shock. Notably, Dr. Brody was not "aware of any event between July 18th and July 30th other than the electrical shock that would cause Mr. Arneson to go into atrial fibrillation." However, when made aware that Arneson experienced heart palpitations within days of the electrical shock, he acknowledged there might be a relationship between the electrical shock and the AFib.

[¶37.]     Dr. Elkins' opinions were also based on the relative probabilities of developing AFib from electric shock and hyperthyroidism. However, he admitted that all of Arneson's symptoms are signs of someone with an electric shock injury and that even 50 volts of electricity can cause AFib. While Arneson reported no cardiac symptoms immediately following the incident, Dr. Elkins testified that it is

common for people to ignore brief transient palpitations and then have a full-blown AFib episode.

[¶38.] The Department resolved the causation issue contrary to Dr. Elkins' opinion, noting "[t]he Department is persuaded by Dr. Holloway's analysis and his conclusion that it is more likely than not that Arneson developed AFib as a result of the electric shock." Dr. Elkins testified live, and we "recognize the Department's advantage in judging credibility of witnesses and review for clear error." *News Am. Mktg.*, 2022 S.D. 79, ¶ 32, 984 N.W.2d at 136 (citation omitted). "'Due regard shall be given to the opportunity of the agency to judge the credibility of the witness.'" *Id.* at 137.

[¶39.] Arneson testified live and explained that in the "*first couple of days*" after the injury, he had minor palpitations, which seemed to get worse over time. The Department found Arneson to be credible and that finding is subject to review under the clearly erroneous standard. Dr. Elkins opined "that had Arneson sustained a heart injury from the electrical shock, he would have had symptoms of damage within the first 12-24 hours following the incident, but *he did not show signs of damage or arrhythmia until twelve days later*."[5] Dr. Elkins' opinion is premised on facts inconsistent with those found by the Department. Indeed, Dr. Elkins stated, "it was possible that somebody could experience arrhythmia days after electrocution" and he agreed "that it was common for people who have

---

5. Dr. Brody also testified that if Arneson was feeling heart palpitations the day after the electric shock, "it might possibly make me think that there might have been a relationship between the shock and what he was feeling in between."

developed sustained AFib to have brief 'transient palpitations' that they ignore, but then suffer a full-blown AFib episode." As Arneson testified, this is precisely what he experienced.

[¶40.] All of the medical experts agreed that an electric shock can affect the heart's rhythm, as can hyperthyroidism. Arneson's heart condition is compensable if the electric shock alone, or in combination with the hyperthyroidism, was a major contributing cause of his heart condition. *See Hayes v. Rosenbaum Signs & Outdoor Advert., Inc.*, 2014 S.D. 64, ¶ 29, 853 N.W.2d 878, 885–86 (citing SDCL 62-1-1(7)(b)) ("[i]f the injury combines with a preexisting disease or condition to cause or prolong disability, impairment, or need for treatment, the condition complained of is compensable if the employment or employment related injury is and remains a major contributing cause of the disability, impairment, or need for treatment." (alteration in original)).

[¶41.] The Department's factual findings related to in-person witness testimony are supported by the record and are not clearly erroneous. Having assessed the testimony presented by deposition in a de novo review, we affirm the Department's determination that Arneson met his burden of proving that the electric shock was a major contributing cause of his heart condition.

> ### 2. *Whether the Department erred in determining Arneson proved his workplace injury was a major contributing cause of his hand condition.*

[¶42.] It is uncontested that Arneson sustained burns to several of his fingers on his right hand due to the electric shock. Employer/Insurer claims, however, that Arneson's right-hand numbness is unrelated to the electric shock, arguing that

Arneson failed to present expert testimony supporting this conclusion. Both the Department and circuit court concluded the electric shock was a major contributing cause of Arneson's hand condition. By notice of review, Employer/Insurer appeals.

[¶43.]		Dr. Holloway opined that Arneson's issues with his hand—numbness, tingling, weakness—were caused by the electric shock. He explained:

> With respect to the hand and nerve injuries that created the numbness and tingling and the difficulty with fine motor skills and manipulating things, there is really not much we can do except wait. When nerves are severely damaged, they die at the origin of the spinal cord. They will sometimes regenerate. The regenerative process can take up to two years. So sometimes people will come in and they'll have really, really, really bad numbness of their hand or motor dysfunction and over time they will recover a lot of that function. He's recovered some of that function. His numbness is not as bad as it was before when we first started, but it's still there.

[¶44.]		Dr. Elkins testified that the electric shock was not a major contributing cause of Arneson's hand issues, "[w]ith the only possible exception some numbness in the fingertips." The basis for that opinion was that "his current right hand symptoms are very different from what he had and what would have been due to the electrical injury right after it happened." Dr. Elkins noted that two days after the injury, Arneson had "finger paresthesias," he reported "slight numbness in his fingertips," and he was able to move his thumb fully at that time but had "some tingling and a little bit of numbness."[6] Dr. Elkins thought a

---

6.	Paresthesia refers to "a burning, itching, tingling, or prickling sensation that is usually felt in the hands, arms, legs, or feet." *See Glossary of Neurological Terms, Paresthesia,* Nat'l Inst. of Neurological Disorders & Stroke, https://www.ninds.nih.gov/health-information/disorders/glossary-neurological-terms#-P- (last visited Oct. 9, 2024).

different cause needed to be considered because he could not explain why Arneson's

fingers were getting worse. He testified:

> Well, that's something that changed over time, the location of what his complaints were. And I pointed that out in the report. The burns, I don't find any record that there was burn to the thumb. The burn seemed to be confined to the fingers. Okay? And that's consistent at least early on in the records. His symptoms, when he went to the orthopedist the next day, in addition to the burns, included some numbness into what would be carpal tunnel distribution, which would include the thumb. I didn't see any record that the thumb was burned. I could see records that the fingers were burned.
>
> . . .
>
> I mean, that's -- that's important in determining causation. When the symptoms change over time, you -- medically you should be rethinking the diagnosis. There was no incoordination early on. The orthopedist documented normal strength, normal range of motion. Later on he would lose range of motion in his thumb. He would have incoordination. He didn't know how hard he was squeezing things. Pressure sensation, there are different nerve fibers than nerves going to muscle or bringing sensation back and forth. So that's a significant difference as well, just that he has lost pressure sensation. His symptoms are significantly different and in a different location than he had early on. The diagnosis needs to be rethought, in my opinion, that all -- that all of his current symptoms are from that electrical injury. That -- I don't see the support for that medically.

However, Arneson's medical records reveal that two days after the electric shock,

Arneson told the orthopedic physician that he had numbness in his thumb, index

finger, and middle finger.

[¶45.] Dr. Elkins indicated that Arneson's numbness and tingling in his

fingers could be attributed to carpal tunnel. However, he testified that electric

shock could also cause carpal tunnel, explaining that "anything that caused

increased pressure in the carpal tunnel can lead to carpal tunnel syndrome. So if he

had an electrical injury that caused burns on the fingers, it would be possible to have, you know, even a slight degree of swelling that could produce the symptoms of that. It's possible." Dr. Brody offered no opinion as to the causation of Arneson's hand issues.

[¶46.] The Department's decision and the circuit court's memorandum opinion both relied on testimony from Dr. Holloway in support of their findings regarding Arneson's hand condition. We find no clear error in the Department's credibility determinations of the in-person witnesses, and we agree with the Department's assessment of the witnesses whose deposition testimony was presented. *See News Am. Mktg.*, 2022 S.D. 79, ¶ 32, 984 N.W.2d at 136–37. The record supports the Department's determination that Arneson sustained his burden of proving the electric shock was a major contributing cause of his hand condition.

### 3. *Whether the Department erred in determining Arneson proved he was permanently and totally disabled and entitled to benefits under the odd-lot category.*

[¶47.] Arneson claims the circuit court erred in reversing the Department's determination that he established he is permanently and totally disabled under the odd-lot category. "'Whether a claimant is entitled to odd-lot disability benefits is a question of fact subject to review under the clearly erroneous standard.'" *Fair v. Nash Finch Co.*, 2007 S.D. 16, ¶ 19, 728 N.W.2d 623, 632 (citation omitted). "The facts of each case determine whether there is sufficient evidence to support the Department's findings that the claimant was permanently and totally disabled under the odd-lot doctrine." *Id.* ¶ 20, 728 N.W.2d at 633.

[¶48.] SDCL 62-4-53 sets forth the criteria to establish permanent disability:

> An employee is permanently totally disabled if the employee's physical condition, in combination with the employee's age, training, and experience and the type of work available in the employee's community, cause the employee to be unable to secure anything more than sporadic employment resulting in an insubstantial income.

Arneson has attempted to establish inclusion in the odd-lot category by the first of two avenues explained in *Fair*, 2007 S.D. 16, ¶ 19, 728 N.W.2d at 632:

> [I]f the claimant is obviously unemployable, then the burden of production shifts to the employer to show that some suitable employment is actually available in claimant's community for persons with claimant's limitations. Obvious unemployability may be shown by: (1) showing that his physical condition, coupled with his education, training, and age make it obvious that he is in the odd-lot total disability category, or (2) persuading the trier of fact that he is in fact in the kind of continuous, severe and debilitating pain which he claims.

(Citation omitted.)

[¶49.]      At the time of his injury, Arneson was nearly 63 years old, and he was 67 years old at the time of the Department's hearing. He obtained his GED and an associate degree in finance, but all his job experience involved maintenance and repair.

### Dr. Holloway's opinions on Arneson's limitations

[¶50.]      Dr. Holloway explained that Arneson's heart issues limit his ability to work because he has "problems with being dizzy, lightheaded, unable to stand," and because of AFib, he could fall or collapse. Therefore, he discouraged Arneson from "engaging in occupations where some loss of consciousness or awareness or dizziness or lightheadedness can be an injury, so we don't like them doing roofing or climbing on ladders. And a lot of the manual occupations are like that. You know, working on a highway, for example."

[¶51.]     Regarding Arneson's hand function, Dr. Holloway testified:

> He has difficulty with fine motor skills. He can't feel things that
> he's picking up or touching, which makes it essentially unsafe
> for him to deal with any -- and, more importantly, it's his
> dominant hand. So he can't sense hot and cold well. He can't
> necessarily sense pain well, meaning that if he were to be
> operating a piece of equipment and be touching it in a way that
> would cause an injury, whereas you and I would recognize that
> immediately, he won't recognize it immediately and, therefore,
> you know, sustain a serious injury simply because of the lack of
> sensation.

Dr. Holloway also stated:

> [Arneson] still has objective sensory loss in distribution of the
> nerves that were damaged before in his right hand. He grabs
> things differently than you and I do. He won't use his thumb,
> the tip of his thumb to grab things because he can't feel with it.
> So he grabs with the joint and the thumb rather than the tip of
> the thumb (indicating), and that's making it difficult. . . .

Dr. Holloway opined that Arneson's "loss of sensation of the fingertips and the
thumb" has made that hand "much less useful. He can grab things, but he can't
really feel what he's grabbing." He explained that due to that sensory loss, Arneson
could "sustain a serious hand injury in a situation where they were operating
equipment or machinery," and there are a "lot of things that he can't do safely with
his hands anymore."

[¶52.]     Dr. Holloway testified about Arneson's limitations due to his heart and
hand conditions and the resultant work restrictions, including a two-hour per day
time limit for standing or walking and a four-hour per day time limit for sitting. He
testified that Arneson was also limited in the ability to use his right hand because
he could not grasp or detect hot and cold. Dr. Holloway indicated it would be

dangerous for him to operate machinery. Dr. Holloway imposed work restrictions that were consistent with those considerations.

*Dr. Elkins' opinions on Arneson's limitations*

[¶53.]        In his IME report, Dr. Elkins opined that none of Arneson's work restrictions were the result of the electric shock injury. He stated the restrictions for the "subjective partial numbness" of those fingers are "not clearly related" to the electric shock. He noted Arneson had been "able to work with the numbness without any related restrictions for close to a year before retiring," and Arneson "currently displays light callousing of all his fingers, indicating use of the right hand is ongoing despite the subjective numbness."

*Audet's vocational opinions*

[¶54.]        Arneson presented in-person testimony from Tom Audet, a certified vocational rehabilitation counselor. Audet completed a vocational evaluation of Arneson to determine his ability to work and earn a living in light of his injuries. Audet testified that considering Arneson's past work history and his present work restrictions, there was just one available job that was appropriate for Arneson, and it was a supervisor position. The other potentially available positions "ranged from medium work to heavy work and, in my opinion, would require good use of both upper extremities to perform those occupations for reaching, handling, fingering, feeling, not so much feeling, but reaching, handling and fingering would probably in those occupations have to be done in a frequent level and I think he would have to have good bimanual dexterity to perform those jobs." In Audet's opinion, while there were some sedentary positions potentially available to Arneson, "when you

factored in his residual functional capacity, I didn't find that he could do those sedentary jobs."[7]

[¶55.]    Audet concluded:

> I don't think he's capable of earning at his workers' compensation rate. And, in all likelihood, I think with the problem that he's having with his right hand, the fatigue issues and the AFib issues that even maintaining gainful employment is going to be very problematic. I don't think he's employable.

Audet opined that Arneson could not do sedentary assembly-type jobs because he could not use both hands well enough. And, while he may be physically capable of doing a customer service job, he would "have to primarily do the job with his left hand, with his nondominant hand and I would expect that he would be a lot slower, especially using the hunt and peck [typing] method." He also explained that with a customer service job, if Arneson had "customers standing there waiting to talk to him and they want his services and he goes into an AFib situation and has to retreat or withdraw from that situation and the customers are just sitting there kind of stranded wondering what's going on and [Arneson] is not able to handle the situation or deal with it."

### *Carroll's vocational opinions*

[¶56.]    Employer/Insurer's vocational expert, James Carroll, testified that the labor market in the northern Black Hills is very good, there is a shortage of qualified employees, and employers are willing to make accommodations. Carroll

---

7.    According to Audet, "residual functional capacity" is "the types of physical abilities that a person would have after they've been injured." It is based on things like the physician's work restrictions, a functional capacity evaluation, and on the claimant's subjective feeling of what they can and cannot do physically.

testified that it did not make sense that Arneson could only sit for a limited period of time but could drive up to six hours a day and that Arneson could not "simple grasp," but he could "firm grasp." In other words, he did not accept and apply Arneson's work restrictions imposed by Dr. Holloway.

[¶57.] In Carroll's opinion, Arneson is marketable as an employee because of his education and good work history. He noted several jobs he believed Arneson could do that were within Arneson's restrictions and that paid at least his workers' compensation rate. Carroll concluded:

> Based on a labor market survey conducted in the Northern
> Black Hills, including Lead-Deadwood, Sturgis, and Spearfish,
> there have been employment opportunities identified which
> would be within Mr. Arneson's physical capabilities, skill levels
> and which would pay at or above his workers compensation
> benefit rate. . . . It is my vocational opinion, Mr. Arneson is
> employable in the Northern Black Hills in an occupation within
> his physical capabilities, skill levels and which would pay at or
> above his workers compensation benefit rate.

[¶58.] Both Audet and Carroll testified in person before the Department. Audet reviewed Arneson's medical history, the medical experts' reports, and the report of the Employer/Insurer's vocational expert, Carroll. While Audet was able to locate jobs that Arneson was qualified for and could perform within the work restrictions, he opined that due to his age and restrictions, it was futile for him to seek a job, and retraining was not feasible. He, therefore, concluded Arneson was permanently and totally disabled and not capable of earning his workers' compensation rate. The Department accepted Audet's opinion as "accurate." Immediately after outlining Audet's opinions, the Department concluded that Arneson was obviously unemployable.

[¶59.]     Carroll found jobs that he believed Arneson could do but disregarded some of Arneson's limitations, concluding they were subjective.  When Carroll (or his employee) spoke to employers regarding possible jobs for Arneson, they informed them he had limited use of his right hand, but they said nothing about his fatigue or AFib.  In *Eite v. Rapid City Area School District 51-4*, 2007 S.D. 95, ¶ 28, 739 N.W.2d 264, 273, the Court held an "expert's listing of jobs that focuses on a claimant's capabilities to the exclusion of his limitations is insufficient as a matter of law.  When prospective employers were not informed of the nature of the limitations they needed to accommodate, there was no basis for the expert's opinion in concluding that the employers were willing to make modifications to meet those limitations."

[¶60.]     Both vocational experts testified in person, and the Department's assessment of their credibility is entitled to deferential review.  By accepting Audet's assessment of Arneson's employability, the Department implicitly rejected Carroll's assessment.  Considering Arneson's age (beyond the typical age of retirement), his education and work experience, work restrictions, and physical condition, we are not firmly convinced the Department erred in determining Arneson met his prima facie showing of obvious unemployability.

[¶61.]     The Department concluded that because Arneson sustained his burden of proving obvious unemployability, it was "unnecessary for the Department to consider the availability of suitable employment in his community."  This was an error.  Once Arneson established he was obviously unemployable, the Department was required to determine if the Employer/Insurer demonstrated that some suitable

employment within Arneson's limitations was actually available. *See Fair*, 2007 S.D. 16, ¶ 19, 728 N.W.2d at 632. While the Department did not specifically address the availability of suitable employment, it did issue findings of facts and conclusions of law related to that issue.

[¶62.] The Department found "Arneson has physical limitations that restrict what sorts of jobs he can do involving his hands, and he must take regular, unpredictable breaks of between 10 and 30 minutes." The Department also stated that Arneson "is within the age of retirement and would require training in a new position." The Department noted that Audet was unable to find jobs that Arneson could perform with his restrictions, education, and work history. Audet's search for suitable employment for Arneson included his review of all relevant testimony and reports, including those of Employer/Insurer's expert Carroll, and Arneson's residual functional capacity based on the physical capacities form.

[¶63.] The record contains additional evidence regarding whether suitable employment was available. Audet explained the basis for his conclusion that other occupations were not suitable for Arneson, including the fact that many of them "require good use of both upper extremities to perform those occupations for reaching, handling, fingering, feeling, not so much feeling, but reaching, handling and fingering would probably in those occupations have to be done in a frequent level and I think he would have to have good bimanual dexterity to perform those jobs." Audet also excluded many sedentary occupations, noting that while Arneson "might have some computer skills and things like that and that he had some decent computer skills pre-injury, . . . when you factored in his residual functional capacity,

I didn't find that he could do those sedentary jobs." Audet concluded: "I don't think that even if there were some kind of job he could do on a part-time basis, I don't think I could identify anything that he could earn at his workers' comp rate."

[¶64.]    Audet's testimony refuted Carroll's opinion that Arneson could find suitable employment as a front desk associate, explaining that Arneson has no experience in such a position and the difficulties Arneson would have in performing the duties of that position, including typing one-handed, standing for a long time, needing to take breaks, and needing to withdraw if he goes into AFib. Audet explained that employment as a cashier or as a food service worker was also impractical for many of the same reasons, based on his limitations with his grip, lifting, and dexterity. As the Court explained in *Billman*, while Employer/Insurer "do not need to place [claimant] in a job, they need to show more than the 'mere possibility of employment.'" *Billman*, 2021 S.D. 18, ¶ 48, 956 N.W.2d at 825 (quoting *Capital Motors, LLC v. Schied*, 2003 S.D. 33, ¶ 12, 660 N.W.2d 242, 247 (upholding Department's finding that employer failed to show suitable employment available because it identified only two positions and claimant was not qualified for one position and the other may have paid below his workers' compensation rate)) (citing *Spitzack v. Berg Corp.*, 532 N.W.2d 72, 76 (S.D. 1995) (circuit court overturned Department's finding that employer found suitable employment because employer only found one position which was not suitable for claimant's limitations)).

[¶65.]    Based on our review of the entire settled record, we conclude that the Employer/Insurer failed to establish there was suitable employment for Arneson with his work restrictions and considering his training and work experience.

Accordingly, we affirm the Department's determination that Arneson was permanently and totally disabled under the odd-lot category.

[¶66.]     The circuit court erred in reversing the Department's determinations on the causation of Arneson's AFib and permanent total disability. We reverse this part of the circuit court's ruling and reinstate the Department's original order as to those determinations. We affirm the circuit court's determination that the Department correctly found that Arneson's work injury was a major contributing cause of his hand condition.

[¶67.]     JENSEN, Chief Justice, concurs.

[¶68.]     SALTER, Justice, concurs specially.

[¶69.]     KERN and DEVANEY, Justices, concur in part and dissent in part.


SALTER, Justice (concurring specially).

[¶70.]     I agree with my colleagues on the causation issues; Arneson established that his employment was a major contributing cause of both his heart arrythmia and his hand condition. In my view, Arneson also established that he was entitled to permanent total disability benefits, as determined by the Department, and there is no need to remand the case to consider the availability of employment in the community. As it relates to the Department's vexing statement that it was "unnecessary . . . to consider the availability of suitable employment in his community" because Arneson made a "prima facie showing of permanent and total disability[,]" I offer two observations.

[¶71.]     First, the statement did not relate broadly to the Department's overall permanent total disability analysis. The Department separated the permanent total determination into two distinct time periods: (1) the time after Arneson voluntarily left his job and retired until Dr. Holloway imposed work restrictions on February 3, 2020; and (2) the time after February 3, 2020. *See* n.4, *supra*. The Department's incorrect legal statement related only to its decision to *deny* permanent total disability benefits for the pre-February 3 period, and that decision is not an issue in this appeal.

[¶72.]     Second, given its context, I suspect that the patently erroneous sentence may well reflect a syntax error and probably should read, ". . . Arneson has <u>not</u> met his prima facie showing . . . ." In the Department's written decision, this statement is contained within a sentence that concludes the paragraph in which the Department details the reasons why Arneson has *not* demonstrated he was permanently and totally disabled prior to February 3, 2020. Such a failure of proof for this initial period logically explains why the Department would decline further inquiry into suitable employment in the community. Significantly, the non sequitur sentence is an anomaly; SDCL 62-4-53's burden-shifting rules are correctly stated elsewhere in the Department's decision and findings and conclusions.

[¶73.]     Regardless, the erroneous statement did not impact the permanent total disability finding for the period after February 3, 2020, which is the only decision before us on appeal. For this determination, the Department considered the expert testimony of Audet and Carroll and concluded that Arneson is "obviously unemployable" relying upon Audet's opinions which it found to be "accurate."

DEVANEY, Justice (concurring in part, dissenting in part).

[¶74.]     I agree with the Department's conclusion that Arneson proved his work injury was a major contributing cause of both his heart and hand conditions. I also agree that the Department did not err in determining that Arneson made a prima facie showing that he is obviously unemployable. However, while I further agree with the majority opinion's determination that the Department erred when it thereafter determined it was "unnecessary for the Department to consider the availability of suitable employment in his community," I disagree with the remainder of the majority opinion's analysis, which undertakes a de novo review of live witness testimony and makes findings of fact on an issue the Department did not address.

[¶75.]     Prior to doing so, the majority opinion acknowledges that the Department "did not specifically address the availability of suitable employment[.]" But the majority opinion then suggests the issue can nevertheless be considered on appeal because the Department issued findings of fact and conclusions of law "related" to that issue. However, all the facts it then points to relate to the Department's determination that Arneson made a prima facie showing of obvious unemployability due to his "age, training, and experience and the type of work available in [his] community." *See* SDCL 62-4-53. Such findings were based on the testimony from Arneson's treating doctor and Audet, Arneson's vocational expert. Importantly, the Department made *no* findings regarding the testimony from Carroll, the Employer/Insurer's vocational expert, relating to the availability of employment in the community. The majority opinion overlooks this by suggesting

that the Department's acceptance of Audet's assessment of Arneson's *employability* means the Department implicitly rejected Carroll's assessment.

[¶76.]     There are two problems with this suggestion.  First, as recognized in SDCL 62-4-53, a prima facie showing of unemployability can be overcome with evidence that there is suitable work regularly and continuously available in the community meeting the necessary income requirement referenced in the statute, notwithstanding an employee's physical condition, age, training, and experience. *Billman v. Clarke Machine, Inc.*, 2021 S.D. 18, ¶¶ 24–25, 956 N.W.2d 812, 819–20. Carroll offered such testimony.  Second, the Department's opinion expressly tells us that it did not "implicitly reject Carroll's assessment."  Instead, the Department made clear that it was not addressing the question because it was "unnecessary" to consider this precise evidence.

[¶77.]     The majority opinion nevertheless does what the Department should have done, but did not do, by weighing the competing live testimony from Audet and Carroll.  This approach is contrary to our well-settled rule that we defer to the finder of fact who is better positioned to review and make credibility determinations relating to live testimony.  *In re Jarman*, 2015 S.D. 8, ¶ 18, 860 N.W.2d 1, 8–9 (noting that "'we defer to the agency on the credibility of a witness who testified live because the agency is in a better position [than an appellate court] to evaluate the persuasiveness of witness testimony'" (alteration in original) (quoting *In re Prevention of Significant Deterioration (PSD) Air Quality Permit Application of Hyperion Energy Ctr.*, 2013 S.D. 10, ¶ 41, 826 N.W.2d 649, 661)).  Notably, the majority opinion makes the requisite finding that was *not* made by the Department,

namely that "Employer/Insurer failed to establish there was suitable employment for Arneson with his work restrictions and considering his training and work experience." In my view, the issue of whether Arneson established that he is entitled to total permanent disability benefits should be remanded to the Department to consider, in the first instance, and whether the Employer/Insurer's evidence established there are suitable jobs available to Arneson in the community.

[¶78.]    KERN, Justice, joins this writing.