#30403-aff in pt & rev in pt-JMK
**2025 S.D. 23**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JOSHUA J. BREWER,                                        Claimant and Appellant,

v.

TECTUM HOLDINGS, INC. d/b/a
TRUXEDO,                                                 Employer and Appellee,

and

BERKSHIRE HATHAWAY HOMESTATE
INSURANCE CO.,                                           Insurer and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CHRISTINA L. KLINGER
Judge

\* \* \* \*

JAMI J. BISHOP
RONALD A. PARSONS, JR. of
Johnson, Janklow & Abdallah LLP
Sioux Falls, South Dakota

RENEE H. CHRISTENSEN of
Johnson Christensen, Law Office, P.C.
Sioux Falls, South Dakota                                Attorneys for claimant and
                                                         appellant.

THOMAS J. VON WALD of
Boyce Law Firm, LLP
Sioux Falls, South Dakota                                Attorneys for appellees
                                                         employer and insurer.

\* \* \* \*

CONSIDERED ON BRIEFS
APRIL 23, 2024
OPINION FILED **04/16/25**

#30403

KERN, Justice

[¶1.]        Josh Brewer brought a workers' compensation claim for permanent total disability (PTD) benefits against Tectum Holdings, Inc. d/b/a Truxedo and Berkshire Hathaway (collectively referred to herein as Employer) after he suffered a work-related injury in September 2015.  Employer denied his claim.  After a hearing in front of an administrative law judge (ALJ), the Department of Labor (Department) denied Brewer's claim, finding he did not prove that his work-related injury was a major contributing cause of his current condition and ongoing need for treatment.  Further, the Department denied Brewer's claim for PTD benefits.  Brewer appealed the Department's decision and the circuit court affirmed.  Brewer now appeals these decisions.  We affirm in part and reverse in part.

**Factual and Procedural Background**

[¶2.]        Brewer grew up in Yankton, South Dakota.  He attended high school until his sophomore year when he dropped out; but he successfully obtained his GED a year later.  Brewer worked at a variety of jobs during his adolescent and early adult years.  He began working in food service, namely Burger King and Yesterday's Café in Yankton.  By the time he was 18, he was working jobs involving heavy manual labor.  He worked for TMA doing tire rotation; a construction company doing framing, installing doors and windows, and shingling; a grain elevator bagging and delivering 50-pound sacks of feed;[1] and for several companies assembling and delivering furniture.  Brewer started a two-year systems

_____

1.     Brewer filed a workers' compensation claim against the elevator and had bilateral carpal tunnel surgeries as a result of a work-related condition.

-1-

administration training program at Southeast Technical Institute (STI) in 2012, but he left the program after a year-and-a-half in order to work to support his children.

***Brewer's work history***

[¶3.]     During and following his time at STI, Brewer worked for various businesses. These positions included jobs at: Century Business Products working with printers; G&H Distributing producing hydraulic hoses; Casey's convenience store; Bow Creek fabricating metal products; and Muller Industries manufacturing windmills. However, he also experienced intermittent periods of unemployment.

[¶4.]     On June 2, 2015, Brewer, who was then 27 years old and living with his girlfriend and their children, began working at Truxedo located in Yankton. Truxedo manufactures and distributes "soft roll-up covers for pickup beds," sometimes referred to as "tonneau cover[s]." While at Truxedo, Brewer worked ten-to twelve-hour shifts as a shipping clerk whose responsibilities included processing and packaging orders to prepare for shipment. His duties often required him to lift covers and packaging material kits which were five to eight feet long and weighed anywhere from 28 to 60 pounds. During a typical day Brewer would pull an average of 65–80 kits from a shelf or nearby pallet. He would then lift and carry each kit over his shoulder to a staging area where he processed the kit for shipping.

[¶5.]     On September 22, 2015, while going about his usual work responsibilities at Truxedo, Brewer suffered a work injury when he bent down, lifted a cover kit off a pallet, twisted, and heard a pop. Brewer did not immediately feel pain and finished the workday. He started to experience "extreme pain" in his lower back two days later. He continued to work at Truxedo through December

2015, when his pain levels intensified to such a point that he was unable to continue working.[2]  Thereafter, Brewer began to seek medical care for his work injury.

[¶6.]          After approximately a year of unemployment following his departure from Truxedo, Brewer obtained a job at Pathways Homeless Shelter on January 11, 2017.  His responsibilities at Pathways included tasks such as performing room and curfew checks, administering PBTs, cleaning, and getting residents their groceries.  He also helped with small renovation projects.  Brewer's position at Pathways allowed him to sit down for the majority of the shift and take additional breaks to stretch.  Brewer worked at Pathways until May 2018 when the shelter lost a portion of its federal funding and was required to downsize its staff.

[¶7.]          After Pathways, Brewer testified that he struggled to find suitable employment because of the limitations and pain caused by his work-related injury and the need for multiple modalities of medical treatment.  He worked at Starbucks in Vermillion (for one month beginning in April 2019) and Domino's in Vermillion (for roughly 1.5 months beginning in August 2019), but he quit both positions after the jobs required him to perform tasks that aggravated his back pain.  At the time of the March 2022 hearing, Brewer was still unemployed.

***Brewer's medical history***

[¶8.]          Although Brewer received medical care for other conditions prior to his work-related injury on September 22, 2015, the medical history relevant to this

---

2.     Brewer was still on the payroll at Truxedo in the first part of 2016, but he worked his last shift there in December 2015.

appeal is limited to five chiropractic appointments prior to the injury. Brewer first sought chiropractic treatment on May 30, 2015, for "tingling, aching, sharp, burning and shooting" pain in the right thoracic region. Brewer rated his pain as a 7 out of 10 (7/10). During three follow-up appointments in June, Brewer reported slight changes in the location of the pain but stated that his pain had decreased. Later at a July 22, 2015, appointment, Brewer reported that the back pain had been bothering him recently and that it had now developed in his mid and lower back.

[¶9.] Three days following the September 22, 2015 work injury, Brewer again sought care from First Chiropractic for complaints of sharp pain, aching, and stiffness in his lower back. Jim Fitzgerald, DC, diagnosed Brewer with nonallopathic lesions in the lumbar, sacral, and pelvic levels. Accordingly, Brewer received chiropractic manipulative therapy, colloquially known as spinal adjustments, "to the left L5, sacrum and left pelvis spinal level(s)." At a September 29 appointment, Dr. Thomas Stotz, DC, diagnosed Brewer with lumbar sprain/strain, lumbosacral sprain/strain, myalgia and myositis, and nonallopathic lesions at the lumbar and sacral levels. Brewer's treatment plan consisted of receiving spinal adjustments, other supportive therapies, and prescribed home exercises.

[¶10.] Brewer continued treatment at First Chiropractic, and through his first two treatments in October 2015 reported that his pain was alleviating. Dr. Stotz noted that Brewer told him at his October 8 appointment that "he has hardly any pain into his low back anymore and indicates a 95% improvement. He no

longer experiences sharp pain. Bending, getting in or out of the car, getting up from a seated position and lifting only bothers on occasion now."

[¶11.] After the October 8 appointment, Brewer was scheduled for a follow-up appointment four weeks later; however, he returned to First Chiropractic on October 28 because he was experiencing pain in his lower back. Dr. Stotz maintained his previous diagnoses and started Brewer on a renewed series of treatments. Brewer continued to receive treatment throughout November and December, during which he reported that his pain waxed and waned. He consistently described his pain at a 3/10, but experienced pain as high as an 8 or 9/10 at least once a week.

[¶12.] Brewer's chiropractic treatments continued into January 2016. However, his progress stalled and Dr. Stotz placed work restrictions on Brewer until he could be seen by an orthopedist. Brewer sought medical care from Brent Adams, MD, at the Yankton Medical Clinic (YMC) on January 7, 2016. Brewer reported pain in his "lower back, left flank and right flank." He described the pain as radiating "to the left ankle, left calf, left foot and left thigh," and feeling "an ache, numbness and tingling." Dr. Adams ordered an MRI of Brewer's lumbar spine and X-rays of his lumbar spine and pelvis.

[¶13.] Will Eidsness, MD, a radiologist with YMC, examined the MRI and concluded that Brewer had "[e]ssentially mild multilevel degenerative lumbar spondylosis." After reviewing the scans, Dr. Adams determined that Brewer had "degenerative discs at L4-5 and L5-S1" and discussed the results with Brewer at a subsequent appointment. Dr. Adams recommended an epidural injection at L4 and

L5, and it was administered on February 15, 2016. The injection, however, did not relieve Brewer's pain. Brewer was seen again by Dr. Adams on March 22, 2016. He said the pain had not alleviated and he requested another epidural injection.

[¶14.]     Dr. Adams referred Brewer to Great Plains Therapy to begin a course of physical therapy. At Brewer's first session on April 1, 2016, Justin Siemonsma, DPT, noted Brewer's "[i]ntervertebral disc disorders with myelopathy, lumbar region" diagnoses and gave a treatment diagnosis for a sprain of the sacroiliac (SI) joint. Brewer had physical therapy sessions twice weekly until discharged in October 2016 and was given a sacroiliac joint belt to wear. In large part, the physical therapy improved Brewer's mobility and allowed him to jog short distances, lift light to heavy weights, and complete more functional tasks such as mowing, cooking, and doing laundry.

[¶15.]     Employer paid for Brewer's medical care and pain treatment following the work injury until sometime in May 2016, when Insurer refused to cover Brewer's additional treatment based upon the opinions of an independent medical examination (IME) conducted on May 16, 2016. At Employers request, Brewer was seen by Douglas Martin, MD, for the IME at UnityPoint Clinic in Sioux City, Iowa. In preparing for the IME, Dr. Martin, an occupational medicine doctor, reviewed Brewer's medical history, including records from Great Plains, YMC, Avera Sacred Heart Hospital, First Chiropractic, and Brewer's MRI scans from 2016. After examining Brewer, Dr. Martin issued a report indicating that Brewer had "mild, multilevel degenerative lumbar disk disease." Regarding the ongoing cause of Brewer's pain, he opined that:

> Causation, in this case, is based upon review of the medical documentation as presented, as well as interview with the examinee. It does appear that there was some sort of a work related event that occurred on September 22, 2015, which is probably best described as a strain episode. It is unclear why the gentleman continues to have the degree of subjective complaints that he has currently with respect to this seemingly mild issue. Typically, the reason for that would be better explained by psychosocial issues, rather than physical ones.

[¶16.] In Dr. Martin's opinion, Brewer had an impairment rating of one percent of the whole person and had reached maximum medical improvement from the work injury. He also "strongly suggest[ed]" that Brewer return to normal work activities and concluded that Brewer "certainly has the capacity to do" the responsibilities of a shipping clerk.

[¶17.] After receiving Dr. Martin's report, Employer refused to authorize or pay for any further treatment for Brewer's condition. Brewer, nevertheless, continued to seek medical care for his pain. He continued to treat at YMC with Dr. Adams, and he received a left sacroiliac injection from Wade Lukken, MD, at Siouxland Pain Clinic on May 23, 2016. Brewer presented at Lewis and Clark Clinic on June 20, 2016, and was evaluated by Jeffrey Johnson, MD, who attributed Brewer's pain to sacroiliitis. However, Brewer did not receive any treatment at that time. The following day, Brewer again met with Dr. Adams. Because he was still experiencing pain, Dr. Adams recommended Brewer obtain a second opinion.

[¶18.] On June 22, 2016, Brewer returned to Lewis and Clark and Peter Murray, PA-C, ordered X-rays of Brewer's lumbar spine and SI joint. Thomas Posch, MD, reviewed the X-rays and noted that Brewer had mild spondylosis on the lumbar spine and no degenerative changes in his SI joint. Following another

injection by Dr. Lukken, Brewer was again seen by Dr. Johnson on July 5, 2016.

Dr. Johnson referred Brewer to Dr. Lukken for a nerve ablation procedure.

[¶19.] Brewer also sought help at the Orthopedic Institute (OI) in Sioux Falls

for back and bilateral SI joint pain. Mitchell Johnson, DO, examined Brewer and

noted:

> I discussed with Joshua this is somewhat of an [sic] unique
> occurrence to have bilateral sacroiliac joint issues. It is hard to
> argue, however the significance of his response to the sacroiliac
> joint injections. I have suggested he follow up with Dr. Lukken.
> Otherwise, offered him referral for consideration of sacroiliac
> joint fusion although certainly indicated this ought to be a last
> consideration.

[¶20.] As recommended, Brewer followed up with Dr. Lukken at Siouxland on

August 16, 2016. Dr. Lukken administered SI joint injections for "diagnostic and

therapeutic purposes" to determine if radiofrequency ablation could be an effective

course of treatment. Brewer had a follow-up appointment with Dr. Lukken on

September 13, 2016, to discuss the efficacy of the prior injections. Because Brewer

experienced relief from the injections, Dr. Lukken performed a bilateral

radiofrequency ablation of Brewer's SI joints. Brewer continued experiencing pain

following the ablation, however the pain was more isolated to his lumbar spine area

rather than the SI joints. At a follow-up appointment on October 25, 2016, Brewer

received injections at the L4-5 and L5-S1 regions to attempt to alleviate his pain.[3]

While Brewer was able to experience some relief from the injections, his pain

---

3. Brewer had an appointment at OI on October 28, 2016, to address his work
   restrictions. Following his appointment, Dr. Mitchell Johnson noted that
   Brewer was "doing reasonably well" and that it would be appropriate for
   Brewer to work around 20 hours a week.

returned and on November 22, 2016, he received another set of injections, for both therapeutic and diagnostic purposes. Because the pain was still present and the diagnostic information from the prior injections established that they were helpful, Brewer underwent a radiofrequency ablation procedure on his medial branch nerves on December 14, 2016. Brewer did experience relief from the ablation procedure, but noted at an appointment on January 31, 2017, that his SI joint pain had returned. As such, he received another injection in his SI joint.

[¶21.] Brewer was referred to Corey Rothrock, MD, at OI on April 7, 2017. During his consultation, Brewer described his prior treatments and his pain level. Brewer testified that by this time his daily pain was excruciating, rating it at 8/10; he could stand for less than 20 minutes and was spending up to 8 hours during the day lying down. Dr. Rothrock, who had reviewed Brewer's records from OI and the 2016 MRI and X-rays, discussed with Brewer the possibility of undergoing a bilateral SI joint fusion surgery, but explained that this should be a last resort. Brewer chose this surgical option which was performed on May 2, 2017.

[¶22.] In the first few months following the surgery, Brewer did well, and his pain was "significantly improved." He reported only minor pain and soreness at his initial post-surgery follow-up appointments. However, in August 2017, Brewer began experiencing pain in his lower back and buttocks area. To ensure that the fusion hardware was properly placed and not causing pain, Brewer had an MRI on February 12, 2018. Dr. Rothrock concluded that the surgical hardware had fused well in Brewer's back. He prescribed a course of physical therapy for Brewer's low

back pain. Although not addressed by Dr. Rothrock in his report, the radiologist noted that the scan also showed degenerative disk movement at L4-5 and L5-S1.

[¶23.] After receiving a course of physical therapy at Fyzical Therapy in Vermillion from March through July, Brewer was seen by Dr. Rothrock on August 29, 2018, for a post-operative follow-up. Brewer noted that he still had some lingering soreness, especially with certain movements. At a follow-up on September 13, 2018, Dr. Mitchell Johnson ordered lumbar MRI and pelvic CT scans to verify that the fusion was well healed and that the pain was not originating from somewhere else. The radiologist concluded that the fusion hardware was correctly placed and not causing any other problems. The MRI showed that Brewer had "[d]isc dehydration and slight disc narrowing at L4-5 with mild generalized disc bulging." Further, there was evidence of "[m]ild to moderate midline disc protrusion at L5-S1 with annular fissure, slightly more prominent than [the previous scan done in] January 2016."

[¶24.] Dr. Mitchell Johnson related this information to Brewer at a follow-up in October 2018 and recommended that Brewer receive an epidural injection at the L5-S1 level. He received the injection but still experienced pain thereafter. Brewer continued to receive treatment at OI from various doctors and medical professionals. His treatment at OI from 2019–2021 included: multiple trigger point and piriformis injections, medial branch blocks, radiofrequency ablations, bilateral SI joint injections, and L5-S1 steroid injections.

*Procedural History*

[¶25.]	Brewer filed a petition for hearing with the Department on July 1, 2016, seeking workers' compensation benefits from Employer. Employer filed an answer denying Brewer's entitlement to benefits and requesting a hearing. Prior to the hearing, and at the request of Employer, Brewer underwent a second IME. This examination was completed by Wade Jensen, MD, on August 12, 2019, and he issued a report with his findings thereafter. Brewer also submitted to a functional capacity evaluation (FCE) on August 4, 2021, performed by assessment specialist Joan Hansen, DPT, at Sanford Physical Therapy Solutions in Sioux Falls. Hansen opined that Brewer was capable of work but concluded that Brewer could work at most six-hour workdays. Hansen found that Brewer could sit for five to six hours a day in 60-minute increments and could stand for one to two hours a day in 15-minute intervals. She also determined that Brewer could occasionally walk "moderate distances" for up to two or three hours. The FCE also set weightlifting, pulling, and pushing limitations for Brewer.

[¶26.]	The hearing was held on March 24, 2022. Five witnesses testified before the ALJ: Bryan Highland, Brewer, Allissa Llewellyn, Tom Audet, and Katie Medema. The parties also submitted deposition testimony from their respective medical experts, Dr. Corey Rothrock and Dr. Wade Jensen. Brewer also introduced extensive medical records detailing his medical treatment both before and after the work injury.

[¶27.]	Brewer first called Bryan Highland, the operations manager for Truxedo, who explained the job responsibilities of a shipping clerk and that clerks

lift kits that "are anywhere from 28 to 36 pounds[,]" but they also may have to occasionally move items that weigh between 40 and 60 pounds. He also said clerks, like Brewer, work ten-hour shifts and are standing for approximately 90 percent of the shift. Highland said he was unaware of Brewer's work restrictions and that Brewer never asked for a different position or any type of accommodation. He testified that Truxedo had multiple positions available that would fit Brewer's work restrictions. For instance, the company had a part-time hardware aide position where attendants "bag nuts and bolts and manuals" which paid $15.75 an hour. When asked how Brewer was as an employee, Highland testified that Brewer struggled with work attendance even before his injury, enough to be threatened with suspension.

[¶28.] Brewer was next to testify at the hearing. He discussed his education and employment history, and later detailed his experience and job responsibilities while working at Truxedo. Brewer described his work injury that occurred on September 22, 2015, and the pop that he felt in his back when he stood up after lifting a kit off of a pallet on the floor. Brewer said he immediately told one of his co-workers about the injury and later informed HR and his supervisor.

[¶29.] Brewer also detailed his extensive medical treatment following the work injury and how the pain eventually developed in his "left and right groin area, where [his] legs meet[] [his] groin[.]" He explained how he started with chiropractic care but then transitioned to Dr. Adams. After treatment with Dr. Adams, Brewer started physical therapy and was later treated at OI, where he underwent a bilateral SI joint fusion surgery and also received 12 injections, two branch blocks,

and two radiofrequency ablations. He also completed several courses of physical therapy.

[¶30.] With respect to his claim for PTD benefits, Brewer described his work restrictions and how he viewed them as limiting the jobs that were available to him. He testified that he had not been able to find suitable employment even though he had created an account on Indeed and applied for many jobs. He acknowledged, however, that after he received approval for sedentary work in March 2016, he did not ask Truxedo to accommodate his limitations, nor did he inquire about other positions that were better suited for him. Furthermore, he admitted that during his job search he used a résumé that revealed that he sustained a work injury in 2015 and had certain limiting physical restrictions. Regarding his employment history, he listed only his last three jobs at Pathways, Starbucks, and Domino's on his résumé.

[¶31.] Brewer's girlfriend, Allissa Llewellyn, also testified at the hearing regarding Brewer's pain during the relevant time frames. She explained that since the injury, Brewer has been unable to do many household tasks such as laundry, carrying groceries into the house, and yardwork. She testified that Brewer spends multiple hours per day lying in bed and that she rubs his back one or two times each night when he wakes up in pain.

[¶32.] Brewer also called Tom Audet, a certified vocational rehabilitation counselor and expert with 44 years of experience in the field. Audet described his work in conducting assessments as trying to determine "vocationally how a disabling condition or an injury might impact a person's ability to work and earn a

living." Audet performed an evaluation on Brewer and reviewed his medical records as well as the depositions from Highland, Dr. Jensen, and Dr. Rothrock.

[¶33.]    During his examination of Brewer, Audet assessed how long Brewer could work in one session, how long he could sit or stand, and his ability to lift or push items of a certain weight. He opined that Brewer needed a "sit-down kind of job[,]" which could accommodate his physical restrictions, working 30 hours a week with a pay rate of at least $12.90 per hour in order to equal his workers' compensation benefit rate. When asked if there were jobs available to Brewer within his limitations, Audet said, "[T]here are jobs I think that he could do if he can maintain the job at a sedentary level. He's got to get hired, obviously." Audet also noted that, based on Brewer's studies at STI, he believed Brewer was retrainable.

[¶34.]    In addition to Audet's testimony, Brewer offered the deposition of Dr. Rothrock and, by stipulation, all of Brewer's medical records. Dr. Rothrock graduated from the University of Nebraska Medical School and completed an orthopedic residency at Orlando Regional Medical Center. As one of Brewer's treating physicians, Dr. Rothrock testified about his treatment of Brewer following the work injury. He stated that he began treating Brewer as a referral from a colleague after Brewer had exhausted many other conservative treatments.

[¶35.]    Dr. Rothrock reviewed Brewer's medical history as relayed to him at Brewer's intake and the records held by OI. The records revealed that Brewer had previously received intra-articular SI joint injections which provided 80 percent relief and a nerve ablation which Brewer reported provided 80–90 percent relief.

Brewer had also tried physical therapy, chiropractic treatment, pain medications, and anti-inflammatory medication. While many of Brewer's medical records indicated that he suffered from degenerative disk disease, Dr. Rothrock did not agree that the pain originated from this condition. Rather, in Dr. Rothrock's opinion, based on the results of numerous tests performed on Brewer, his pain was isolated to his SI joint. Specifically, Dr. Rothrock noted that SI joint injections are "[o]ne of the best diagnostic tests" because they only target pain originating from the SI joint. Dr. Rothrock also performed the FABER test, which includes flexion, abduction, and external rotation with stress on the SI joint. Dr. Rothrock testified in his deposition that the results of that test localized Brewer's pain to the SI joint.

[¶36.]     In Dr. Rothrock's view, fusion surgery was an appropriate course of action because Brewer had exhausted most of the conservative treatment options available to him. He described the fusion surgery he performed on Brewer, which he considered successful in that Brewer had significant relief from his pain, even though Brewer's pain returned in the months following the surgery.

[¶37.]     Based on his treatment of Brewer and the medical history relayed to him by Brewer, Dr. Rothrock opined to a reasonable degree of medical certainty that the work accident on September 22, 2015, was a major contributing cause of Brewer's current diagnosis and disability. He also concluded that Brewer's work injury was a major contributing cause of the work restrictions placed on Brewer during the FCE.

[¶38.]     Employer's case consisted of the hearing testimony of Katie Medema, a mental health counselor and certified vocational rehabilitation consultant with

OHARA Managed Care, the deposition testimony of Dr. Jensen, and the previously referenced FCE report of Joan Hanson. Medema performed a vocational analysis on Brewer, during which she reviewed Brewer's education, work history and restrictions, the FCE, his medical history, and a 2017 report prepared by vocational specialist, Jim Carroll, also with OHARA.

[¶39.] After considering Brewer's ability to work, Medema concluded in her report that, "It is my vocational opinion based on the available information that because Mr. Brewer does not have permanent work restrictions, he could return to any occupation or position that he held previously." Because Brewer had no restrictions, Medema noted that he was also free to "explore any new occupation or position that he would otherwise be qualified for considering his education and work history." Further, in Medema's opinion Brewer had "retraining options such as completing the Network Administrator degree program that he had been working toward and which is still offered at [STI]. Or he could consider completing an online Information Technology degree program that is offered at [STI]."

[¶40.] In order to analyze the job market truly available to Brewer, Medema completed three distinct employment searches: 1) a job search with no restrictions, 2) a job search with the "six hours per day restriction within the light physical demand," and 3) a job search based on Brewer's subjective feelings for what "he thought he could work in a day as far as length, sitting, standing, that kind of thing." Each of the three job searches yielded jobs available for Brewer. The second search, using the restrictions established in the FCE, resulted in multiple job opportunities, most of which were work-from-home positions. The search using all

of Brewer's subjective criteria revealed three open positions. Medema testified that all of these jobs would have met or eclipsed the workers' compensation rate available to Brewer.

[¶41.]     Medema was also asked to critique Brewer's search for employment. She reported that Brewer completed a handful of job searches in late 2021 and allegedly applied for a number of positions. She testified that she went through each job Brewer applied for and determined whether the employer was hiring and if Brewer complied with the application requirements. She also contacted some of the employers. Based on this information, she indicated in her report that Brewer's job search was inadequate.

[¶42.]     Medema also expressed reservations about the content of Brewer's résumé. In Medema's opinion, it is a "red flag" for employers when an applicant lists what they are not able to do on a résumé rather than listing their skills and positive attributes. Medema felt the focus of Brewer's résumé was "all on what he can't do, not what he can do."

[¶43.]     Employer introduced the April 2021 deposition testimony of Dr. Jensen, a board-certified orthopedic spine surgeon currently employed at the Center for Neurological and Orthopedic Sciences in Dakota Dunes. Dr. Jensen testified that he graduated from the University of Washington in Seattle, followed by a five-year orthopedic residency, after which he focused on spinal surgeries at the University of Utah.

[¶44.]     Prior to completing his August 2019 IME, Dr. Jensen reviewed Brewer's medical history, the imaging studies, and Dr. Martin's IME report. He

also reviewed the records created after the 2019 IME, except for Brewer's December 2020 MRI and the 2015 first report of injury.

[¶45.] In his assessment of Brewer's injury and pain, Dr. Jensen first highlighted the back pain Brewer was reporting before the September 2015 work injury, specifically noting that Brewer rated his worst pain at 7/10. Dr. Jensen classified this rating as "pretty extreme" and noted that it was higher than the pain Brewer was experiencing when he was examined for the IME. When asked whether he agreed that Brewer had no significant history of back pain before the work injury, Dr. Jensen replied, "[n]o" and referred to the chiropractic records and Brewer's 7/10 pain rating on May 30, 2015.

[¶46.] Turning to Brewer's post-injury pain, Dr. Jensen testified that most individuals who experience pain similar to Brewer develop such pain from either acute injuries or degenerative disease, both of which are generally treated conservatively. In Brewer's case, Dr. Jensen opined that based on the imaging studies he reviewed, Brewer suffers from degenerative disc disease—more than the typical 30-year-old—in his lower back, which can cause painful muscle spasms. Dr. Jensen testified that Brewer most likely suffered a muscle strain from the work injury, which would explain the later onset of pain he experienced. However, in Dr. Jensen's view, the muscle strain and accompanying pain were resolved by October 2015, as demonstrated in Brewer's chiropractic treatment records.

[¶47.] Dr. Jensen did not dispute that Brewer experienced pain originating from his SI joint. However, Dr. Jensen opined that, aside from the muscle strain, the September 2015 work injury was not a major contributing cause of Brewer's

continuing medical problems and pain. In Dr. Jensen's opinion, Brewer had a progressive "underlying degenerative disk disease in the lumbar spine, specifically two levels, you know, that tells you that this is a genetically-linked problem." Dr. Jensen determined that the pain Brewer was describing in his SI joint was not caused by the work injury but rather would be typical of "[a] pretty traumatic injury such as [a] massive car accident and injuries[.]" He also noted that "bilateral SI joint problems are incredibly uncommon, [and] almost always associated with some sort of inflammatory condition, ankylosing spondylitis or other condition that would not be work related."

[¶48.] On cross-examination, Dr. Jensen acknowledged that Brewer had received additional treatment after Dr. Jensen's IME. With the exception of the December 2020 MRI which he had not seen, Dr. Jensen indicated that he reviewed the new records before his deposition, and nothing contained therein changed his initial opinion regarding causation. When the results of the 2020 MRI findings were relayed to Dr. Jensen during his deposition, he concluded that they were further evidence of Brewer's degenerative spinal issues and their progression from 2016 through 2020.

[¶49.] Following the hearing and consideration of post-hearing briefs, the ALJ issued a decision, findings of fact, conclusions of law and an order denying Brewer's claim. The ALJ found that Brewer failed to prove the work injury was a major contributing cause of his current condition and that he was not entitled to PTD benefit payments. Brewer appealed the Department's decision to the circuit

court.  The circuit court affirmed the Department's decision, concluding Brewer did

not prove causation and did not establish his claim for PTD compensation.

[¶50.]　　Brewer appeals raising the following issues:

> 1.　　Whether the Department erred when it determined the 2015 work injury was not a major contributing cause of Brewer's condition.
>
> 2.　　Whether the Department erred when it denied Brewer's claim for permanent total disability.

## Standard of Review

[¶51.]　　"We review the Department's decision in the same manner as the

circuit court."  *Hughes v. Dakota Mill & Grain, Inc.*, 2021 S.D. 31, ¶ 12, 959 N.W.2d

903, 907 (citing SDCL 1-26-37).  "The Department's factual findings are given great

weight and will be overturned only if they are clearly erroneous."  *Id.* (citations

omitted).  "The test is whether after reviewing the evidence we are left with a

definite and firm conviction that a mistake has been made."  *Id.* (citation omitted).

However, "[w]e review the Department's factual determinations based on

documentary evidence, such as depositions and medical records, de novo."  *Id.*

(citation omitted).  "The Department's conclusions of law are fully reviewable."  *Id.*

(citation omitted).

## Analysis

### 1.　*Whether the Department erred when it determined the 2015 work injury was not a major contributing cause of Brewer's condition.*

[¶52.]　　Brewer's first claim on appeal is that the Department incorrectly

determined that the 2015 work injury was not a major contributing cause of his

current condition and need for treatment.  It is largely undisputed—both by the

parties and by the expert witnesses—that Brewer suffered a work injury on September 22, 2015. The dispute rests on the type and extent of the injury Brewer suffered. Whether Brewer's work injury was a major contributing cause of his condition centers on review of the documentary evidence contained in Brewer's medical records and Dr. Rothrock's and Dr. Jensen's deposition testimonies. As such, we review the Department's conclusions de novo and afford no deference. *See id.*

[¶53.] "A claimant who wishes to recover under South Dakota's Workers' Compensation Laws must prove by a preponderance of the evidence that [they] sustained an injury arising out of and in the course of the employment." *Fair v. Nash Finch Co.*, 2007 S.D. 16, ¶ 9, 728 N.W.2d 623, 628 (cleaned up). However, we have recognized that just because an individual suffers a work injury "does not automatically establish entitlement to [workers' compensation] benefits[.]" *Haynes v. Ford*, 2004 S.D. 99, ¶ 17, 686 N.W.2d 657, 661. The claimant must prove the work injury was "a major contributing cause of [their] *current* claimed *condition.*" *Id.* But "a claimant is 'not required to prove that his employment was the proximate, direct, *or sole* cause of his injury.'" *Hughes*, 2021 S.D. 31, ¶ 20, 959 N.W.2d at 909 (emphasis added) (citation omitted). Stated another way, "the claimant's work activities do not have to be '*the*' major contributing cause of the injury; they only have to be '*a*' major contributing cause." *Id.* (emphasis added) (cleaned up).

[¶54.] "It is well settled that '[a]n injury is compensable only if it is established by medical evidence[.]'" *Id.* ¶ 21 (alterations in original) (citing SDCL

62-1-1(7)).  Further, "[c]ausation must be established to a reasonable degree of medical probability, not just possibility."  *Id.* (citation omitted).  Brewer's claim of causation ultimately turns on which expert's opinion is most credible regarding the extent of Brewer's work-related injury on September 22, 2015.  The two expert opinions in this case were disclosed through deposition transcripts.  Accordingly, "we do not apply the clearly erroneous rule but review that testimony as though presented here for the first time."  *Arneson v. GR Mgmt., LLC*, 2024 S.D. 61, ¶ 19, 13 N.W.3d 206, 213 (citation omitted).  After a detailed review of the record, we conclude that Brewer met his burden of proving that his work injury was a major contributing cause of his current condition and need for treatment.

[¶55.]        Dr. Rothrock opined to a reasonable degree of medical probability that the work injury was a major contributing cause of Brewer's current condition and need for treatment.  Dr. Rothrock was familiar with Brewer's records at OI, including all of Brewer's examinations and the treatments performed by Dr. Rothrock's colleague, Dr. Johnson.  Although Brewer's records at OI did not include an exhaustive medical history, Dr. Rothrock was aware of the injections and nerve ablation Brewer received, and that these treatments "provided significant relief" to Brewer.  Dr. Rothrock also reviewed Brewer's chiropractic records during his deposition and subsequently testified that, "It looks that . . . [Brewer] was receiving care earlier that year for kind of general spinal dysfunction, but nothing related to the injury."  Dr. Rothrock firmly maintained his causation opinion even after reviewing Brewer's chiropractic records.

[¶56.]     Aside from the experts' awareness of Brewer's various medical records, the main point of contention before the ALJ was whether Brewer's work injury caused his SI joint pain or whether the pain was a result of Brewer's naturally occurring degenerative disease. Dr. Rothrock determined that Brewer's degenerative issues were not the cause of the SI joint pain and opined that Brewer had a normal amount of degenerative damage for a person of his age. In Dr. Rothrock's opinion, Brewer's pain was consistent with a non-degenerative SI joint injury. During Dr. Rothrock's deposition, he was informed that Brewer was able to obtain pain relief when he would lie down, apply ice, exercise, and walk. Dr. Rothrock confirmed that this was consistent with the type of injury Brewer sustained.

[¶57.]     Further, when asked why Brewer did not experience immediate pain following his work injury, Dr. Rothrock, acknowledging he did not "have a perfect explanation," testified that "isolated SI joint pain tends to be more chronic and insidious in its onset for most patients and takes longer to truly diagnose." He testified that it was rare to see an SI joint injury that was not trauma-based, but "in acute settings it's generally a lifting, twisting event which puts stress on the SI joint that causes pain in that location." He also testified that the SI joint fusion surgery was a last resort and was not considered until Brewer exhausted other conservative treatment options. Dr. Rothrock explained that continued or residual joint pain after surgery is not uncommon, even when the surgery is deemed a success.

[¶58.] Employer asserts that Dr. Rothrock's opinion on causation is based on temporal sequencing. That is, Employer argues that Dr. Rothrock relied solely on the fact that Brewer began experiencing pain approximately two days after the work injury. As Brewer acknowledges, Dr. Rothrock's opinion, at least to a certain extent, factors in the timing between the work injury and the onset of pain. This Court has held that "[a]rguments relying *solely* on temporal sequence have 'little value in the science of fixing medical causation.'" *Darling v. W. River Masonry, Inc.*, 2010 S.D. 4, ¶ 18, 777 N.W.2d 363, 369 (emphasis added) (citation omitted). But a careful review of Dr. Rothrock's deposition reveals that his opinion was formed as a result of his personal treatment of Brewer, in addition to temporal sequencing.

[¶59.] Dr. Rothrock testified during his deposition that his opinion was based "off of [Brewer's] history, the physical exam, the severe pain he had, the therapeutic and diagnostic injections that he had related to that area, and subsequent treatment." Dr. Rothrock also testified that he based his opinion, in part, on whether Brewer's description of the work injury was "enough to explain the pain that he had" and Dr. Rothrock believed that it was. Dr. Rothrock's reliance on his examination, diagnosis, and surgical treatment of Brewer's injury garners sufficient support for his determination that the September 2015 work injury was a major contributing cause of Brewer's injury and condition.

[¶60.] Still, Employer argues that Dr. Jensen's opinion is more persuasive than Dr. Rothrock's. Based on our review of the record, we disagree.[4] Although Dr.

---

4. Brewer argues that Dr. Jensen's qualifications are lacking and his opinion is unpersuasive because he has never performed a bilateral SI joint fusion

(continued . . .)

Jensen reviewed most, but not all, of Brewer's medical history and completed an IME on Brewer, he was not one of Brewer's treating physicians. We recently acknowledged that the opinions of a treating physician may, in some cases, be more persuasive than those of a non-treating physician because of the knowledge gained through the claimant's treatment and more generally through treatment of the specific ailment that the claimant suffers. *See Arneson*, 2024 S.D. 61, ¶ 34, 13 N.W.3d at 217.

[¶61.]     Dr. Jensen, in line with Dr. Martin's earlier IME report, concluded that Brewer suffered a muscle strain during the work injury and attributed most of Brewer's lingering pain to degenerative disease. Dr. Jensen agreed that the results of the SI joint injections suggested that Brewer's pain was localized to the SI joint and testified that the SI joint fusion was necessary. However, aside from vague references to degenerative disk disease, Dr. Jensen was not able to articulate an explanation for what was causing Brewer's SI joint pain. He also posited that, "I think you can either say there are some psychological issues or there's some symptom overlay or there's some secondary gain" that could explain Brewer's ongoing symptoms.

[¶62.]     Dr. Jensen heavily relied on the records from Brewer's five chiropractic appointments from May through July 2015 where Brewer reported pre-work-injury

---

(. . . continued)
surgery. Although Dr. Jensen has never performed the surgery, he was familiar with this type of surgery, and even a quick review of Dr. Jensen's training, experience, and education validates his ability to knowledgeably discuss the surgery. Regardless, our opinion of which expert is more credible does not turn solely on a doctor's educational background or training.

back pain to support his causation opinion. However, a careful review of the records illustrates that Brewer's pre-injury pain was not the same in character or severity as his post-injury pain. Brewer sought chiropractic care at First Chiropractic on May 30, 2015, where he reported his pain at 7/10 in the right thoracic region and described "aching" pain in the lumbar region. After receiving treatment, Brewer "commented that [he] felt immediate relief while still in the office." During three appointments in June 2015, Brewer's symptoms improved before Brewer experienced heightened pain in both the thoracic and lumbar spine at the end of July. However, following the July appointment, Brewer did not seek additional chiropractic treatment until after the work injury. At that time, Brewer did not report his pain in the thoracic region as he did before the work injury, rather he reported pain in the lumbo-sacral and sacroiliac region.

[¶63.]       In *News America Marketing v. Schoon*, we concluded that a claimant met her burden to prove causation despite a history of injury to the area when the symptoms from the other injuries had largely resolved before the work injury. 2022 S.D. 79, ¶¶ 26–27, 984 N.W.2d 127, 135–36. Although the record before us does not establish that Brewer's pre-work injury pain had completely resolved before the incident, it is clear that Brewer's pain had been steadily improving. Further, Brewer reported an entirely different type of pain that originated from a different location following the work injury than he had reported pre-injury. Therefore, the extensive weight accorded to Brewer's pre-injury chiropractic records renders Dr. Jensen's opinion less reliable.

[¶64.] Dr. Jensen attributed Brewer's ongoing pain to degenerative disc disease. Specifically, Dr. Jensen noted that Brewer's 2016, 2018, and 2020 MRIs showed degeneration of the L4-L5 disc and L5-S1 disc which Dr. Jensen testified would cause low back pain. However, Dr. Jensen also testified that epidural injections are a helpful diagnostic tool and explained that "if you have an epidural and you're concerned that it could be from maybe the small little disc bulge at the very bottom of his back and you get no response, that tells you it's probably not the right area. That's not what's causing the symptoms." Here, Brewer received an epidural injection at L4-L5, but reported that it provided little relief. Therefore, based on Dr. Jensen's own testimony, the degenerated disc was not the cause of Brewer's pain as evidenced by the ineffectiveness of the epidural injection.

[¶65.] After considering the competing expert deposition testimony and reviewing Brewer's extensive medical records, we conclude that Dr. Rothrock provided a more credible causation opinion that was supported by Brewer's ongoing treatment and symptoms. Therefore, Brewer has established that his September 2015 work injury was, and remains, a major contributing cause of his condition and need for treatment. We reverse the Department's determination that Brewer did not prove his work injury was a major contributing cause of his current condition and need for treatment.

> ### 2.    Whether the Department erred when it denied Brewer's claim for permanent and total disability benefits.

[¶66.] Brewer also asserts that the Department erred by denying his claim for PTD benefits. "Whether a claimant makes a prima facie case to establish odd-lot

total disability inclusion is a question of fact." *Billman v. Clarke Mach., Inc.*, 2021 S.D. 18, ¶ 29, 956 N.W.2d 812, 820 (citation omitted). "The test to determine whether a prima facie case has been established is whether there 'are facts in evidence which if unanswered would justify persons of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain.'" *Id.* ¶ 29, 956 N.W.2d at 820–21 (citation omitted). The ALJ formulated its decision regarding Brewer's claim for PTD benefits after hearing testimony from Highland, Brewer, Audet, and Medema. The ALJ weighed the testimony from the competing vocational experts, and we will defer to those determinations on witness credibility and the weight of the evidence. "Even where specific credibility findings are absent, we defer to the Department's overall assessment of the weight of the evidence when it is based upon live witness testimony." *Id.* ¶ 28, 956 N.W.2d at 820. "Nevertheless, we still review the Department's factual findings for clear error." *Id.*

[¶67.] A determination of odd-lot disability benefits is governed by SDCL 62-4-53. "This Court recognizes two avenues by which a claimant can meet his or her prima facie showing of entitlement to odd-lot disability benefits—(1) claimant is obviously unemployable due to his or her physical condition, coupled with his or her age, training, and experience, or (2) unavailability of suitable employment by showing that he or she has made reasonable efforts to find work and was unsuccessful." *Id.* ¶ 25 (citation omitted). If the claimant makes a prima facie showing of obvious unemployability, "the burden of production shifts to the employer to show that some suitable employment within claimant's limitations is actually available in the community." *Id.* ¶ 30, 956 N.W.2d at 821. "[I]f a claimant

is unable to show obvious unemployability, the claimant must present evidence of 'the unavailability of suitable employment by showing that he has made reasonable efforts to find work and was unsuccessful.'" *Baker v. Rapid City Reg'l. Hosp.*, 2022 S.D. 40, ¶ 32, 978 N.W.2d 368, 378 (citation omitted).

[¶68.]      Brewer contends that he is "obviously unemployable under both avenues of establishing a prima facie case." He argues that his severe, disabling back pain and work limitations, "[c]oupled with his lack of education and training," makes him obviously unemployable. But these claims are refuted by significant evidence in the record. Brewer's time working at Pathways is sufficient to rebut his claim. He began working at Pathways in 2017 and worked there for approximately 14 months. While there, he worked shifts shorter in duration to reduce the chance of back pain flareups, and he also received accommodations that allowed him to relieve any onsets of pain—all while completing a variety of tasks. His job ended at Pathways only because the organization stopped receiving federal funding. Further, Brewer is articulate, has a GED, completed three semesters of course work at STI, and has developed computer skills. Because of this, Medema testified that she believed Brewer was readily retrainable, did not have permanent work restrictions, and could return to any occupation he previously held.

[¶69.]      Brewer also testified that after working at Pathways he would frequently watch his children who ranged in ages from two to six. He testified that he would take the children swimming and fishing, and that he also went deer hunting. The ALJ took this information regarding his capacities into account when considering Brewer's claim for odd-lot benefits.

[¶70.]     While Brewer may experience pain after standing or sitting for certain periods of time, he did not persuade the ALJ that he was obviously unemployable in light of his young age, work experience, training, and technical education at STI. After a review of the record, the ALJ's finding regarding the first avenue to establish odd-lot benefits is not so contrary to the evidence as to render the finding clearly erroneous.

[¶71.]     Brewer also argues that he "clearly established the unavailability of suitable employment by showing that he . . . made reasonable efforts to find work and was unsuccessful." Brewer characterizes his effort in looking for a job as "exceptional" because he "registered with Indeed, he looked on his own for work, and he tried to apply for every position identified by Audet and Medema." But there was sufficient evidence from which the ALJ could have concluded otherwise.

[¶72.]     In fact, although Brewer registered with Indeed and applied for dozens of jobs, there is evidence in the record that he did not make a good faith search for work. Medema's unrefuted testimony reveals that on many occasions, Brewer did not follow the employer's application instructions, did not respond when employers asked for further information, and made his physical limitations the focal point of his résumé. In fact, Brewer's own vocational expert agreed that highlighting physical limitations in the manner that Brewer did on his résumé would be a "red flag" for employers and that Audet "wouldn't have recommended he do that." Audet also acknowledged that Brewer had "sizable" periods of unemployment and that many of his jobs were short-lived, which could be concerning to employers.

[¶73.] We have long applied a reasonableness standard to an odd-lot claimant's job search efforts. *See, e.g., Spitzack v. Berg Corp.*, 532 N.W.2d 72, 75 (S.D. 1995). And, as the ALJ found, "[m]any actions by Brewer in his search for employment show his job search was not reasonable." There is evidence in the record to support this finding, and therefore, it was not clearly erroneous.

[¶74.] But even if Brewer could make a prima facie showing under either method of establishing odd-lot benefits, Employer presented sufficient evidence to show that there was suitable employment available to Brewer. We have held that "[w]hile it is not required that an employer actually place a claimant in an open job position, more than the mere possibility of employment must be shown; the employer must establish that there are positions actually open and available." *Billman*, 2021 S.D. 18, ¶ 43, 956 N.W.2d at 823 (citation omitted). Not only did Highland say that Truxedo could have made accommodations for Brewer within his limitations, he identified three openings at Truxedo that were immediately available that would accommodate Brewer's physical restrictions and meet or exceed his workers' compensation rate.

[¶75.] Medema also testified that she made multiple job searches with varying degrees of limitations and found work available for Brewer in each category. Her search using the restrictions implemented in Brewer's FCE identified several positions that would have satisfied all of Brewer's requirements. She also conducted a search using all of Brewer's subjective complaints and restrictions and was still able to locate several available job opportunities for Brewer that would have satisfied his requirements. As the ALJ determined, "Employer and Insurer

have shown that there are specific positions in Brewer's community that are available to him, fit his FCE requirements, and meet his compensation rate."

[¶76.] After reviewing the record, we cannot say the ALJ's findings regarding Brewer's claim for odd-lot benefits were clearly erroneous.

### Conclusion

[¶77.] Because Brewer established that his work injury was a major contributing cause of his current condition and need for treatment, we reverse the ALJ's holding to the contrary and remand for further proceedings consistent with this opinion. We affirm the Department's denial of permanent total disability benefits.

[¶78.] JENSEN, Chief Justice, and SALTER, Justice, concur.

[¶79.] DEVANEY and MYREN, Justices, dissent.

MYREN, Justice (dissenting).

[¶80.] I would affirm the Department's determination that Brewer failed to establish that his work-related injury was a major contributing cause of his condition. Brewer had the burden to "prove all elements necessary to qualify for compensation by a preponderance of the evidence." *Arneson v. GR Mgmt., LLC*, 2024 S.D. 61, ¶ 16, 13 N.W.3d 206, 213 (citation omitted), reh'g denied (Dec. 5, 2024). However, it is not enough to prove that an injury was work-related; "the claimant must prove that the work-related injury is *a* major contributing cause of his claimed condition and need for treatment." *Id.* (citation omitted).

[¶81.] This case involved the classic battle of the experts. Brewer's medical expert was Dr. Rothrock. The Employer's expert was Dr. Jensen. Neither testified

live before the Department. Instead, their testimony was presented through their deposition transcripts and reports. Where the Department's factual findings are based on documentary evidence, our standard of review is de novo. *Id.* ¶ 15, 13 N.W.3d at 213 (citation omitted).

[¶82.] After carefully reviewing the evidence before it, the Department determined that Brewer had not sustained his burden. Specifically, the Department concluded that Dr. Rothrock's opinion was less reliable because it was not based on a review of Brewer's complete medical records. After a careful de novo review of the same record, the circuit court reached the same conclusion: Dr. Rothrock's opinion was less reliable. The majority reaches the opposite conclusion, accepting Dr. Rothrock's opinion as the most reliable. I disagree with the majority's assessment of this battle of the experts for the following reasons.

[¶83.] "The value of the opinion of an expert witness is no better than the facts upon which it is based. It cannot rise above its foundation and proves nothing if its factual basis is not true. It may prove little if only partially true." *Hughes v. Dakota Mill & Grain, Inc.*, 2021 S.D. 31, ¶ 23, 959 N.W.2d 903, 910 (citation omitted) (noting that a "fail[ure] to examine key information" rendered an expert's opinion less reliable).

[¶84.] Dr. Rothrock admitted at his deposition that he had not reviewed Brewer's medical records from four medical institutions: Yankton Medical Clinic, Great Plains Therapy, Fyzical Therapy, and Sanford Health. He also admitted that he did not review the IME reports completed by Dr. Jensen and Dr. Martin. Dr.

Rothrock, like the expert in *Hughes*, failed to examine the pertinent medical records.

[¶85.] Perhaps most significant was Dr. Rothrock's failure to review Dr. Jensen's IME report. To complete that report, Dr. Jensen reviewed all of Brewer's medical records, including his imaging studies. According to Dr. Jensen, those imaging studies revealed that Brewer suffers from degenerative disc disease. Dr. Jensen compared Brewer's MRIs from 2016 and 2018 and noted degenerative changes in that period. Dr. Jensen also noted that Brewer had been experiencing back pain and was receiving chiropractic care prior to the work injury.

[¶86.] Dr. Jensen opined that Brewer's work injury caused only a muscle sprain, which had resolved in six to eight weeks. Dr. Jensen found support for that opinion in Brewer's chiropractic records, which reflect that Brewer's pain began improving in early to mid-October 2017. Dr. Jensen explained that the strain would have resolved by May 16, 2016, and any pain present after that was attributable to degenerative disc disease established by the diagnostic scans and medical records from before the work injury.

[¶87.] Dr. Jensen also opined that bilateral sacroiliac (SI) joint pain was uncommon and generally caused by a traumatic event, like a major car accident. Indeed, he noted that such pain was so unusual that it would be "reportable" in scientific journals if it were sustained from an injury like the one described by Brewer. Dr. Jensen concluded that Brewer suffered "a sprain/strain from which he resolved and predominantly got better, and based on the records, his MMI date for that injury would have been 05/16/2016, as assigned by Dr. Martin." Based on his

comprehensive review of all of Brewer's medical records, Dr. Jensen opined that

Brewer's work injury was not a major contributing cause of Brewer's condition.

[¶88.] Dr. Martin also conducted an IME of Brewer in May 2016. He

performed a physical examination of Brewer and reviewed his medical records

(including those Dr. Rothrock did not review). Dr. Martin explained his assessment

in his report:

> Although I would state that the treatment of this condition certainly should be conservative in its nature, it is difficult for me to explain why he continues to have the degree of subjective symptoms that he has, given the objective findings. Thus, there is a strong possibility here that the gentleman is having outside psychosocial factors that are interfering with his recovery.

Ultimately, Dr. Martin opined:

> Causation, in this case, is based upon review of the medical documentation as presented, as well as [an] interview with the examinee. It does appear that there was some sort of a work related event that occurred on September 22, 2015, which is probably best described as a strain episode. It is unclear why the gentleman continues to have the degree of subjective complaints that he has currently with respect to this seemingly mild issue. Typically, the reason for that would be better explained by psychosocial issues, rather than physical ones.

[¶89.] Brewer's other providers also attributed Brewer's pain to degenerative

disc disease. For example, the conclusion from the January 2016 MRI was that

Brewer had "[e]ssentially mild multilevel degenerative lumbar spondylosis." The

result of Brewer's February 2018 MRI was similar—mild to moderate disc

degeneration.

[¶90.] In the chiropractic records that Dr. Rothrock failed to review, Dr. Stotz

noted on October 8, 2015, that Brewer "has hardly any pain into his low back

anymore and indicates a 95% improvement. He no longer experiences sharp pain.

Bending, getting in or out of the car, getting up from a seated position and lifting only bothers on occasion now." Similarly, the physical therapy records (not reviewed by Dr. Rothrock) reflect that as of October 2016, Brewer had improved mobility, and he was able to jog short distances, lift light to heavy weights, and complete more functional tasks such as mowing, cooking, and doing laundry. Brewer was discharged from physical therapy with Great Plains on October 7, 2016. In July 2018, additional physical therapy notes stated that Brewer was "doing well with everything and has no complaints of any SI pain with exercise."

[¶91.] In addition to the fact that Dr. Rothrock's opinion was not based on a complete picture, it was also based partially on Dr. Rothrock's acceptance of Brewer's report that the pain followed the work injury. Dr. Rothrock testified that he "chatted with [Brewer] about his back and his injury, and he said prior to this one episode where things started on this day that he remembers doing this, he did not struggle with back pain or have any other issues related to his low back[.]" The record clearly establishes that Brewer's reporting was not accurate because his medical records demonstrate that he received treatment for back pain before the work injury occurred. Essentially, Dr. Rothrock accepted the temporal sequencing reported to him by Brewer. Not only was this reported temporal sequencing inaccurate, but this Court has previously observed that opinions "relying solely on temporal sequence have 'little value in the science of fixing medical causation.'" *Darling v. W. River Masonry, Inc.*, 2010 S.D. 4, ¶ 18, 777 N.W.2d 363, 369 (citation omitted). Dr. Rothrock's opinion is undermined by his reliance on Brewer's

inaccurate report of temporal sequencing, coupled with his lack of knowledge regarding Brewer's pre- and post-injury medical records.

[¶92.] In sum, Dr. Rothrock's failure to review and consider the totality of Brewer's medical history undermines the reliability of his causation opinion. Both Dr. Jensen and Dr. Martin completed a comprehensive review of all of Brewer's pertinent medical records. They reached the same conclusion: degenerative changes caused Brewer's condition, and his work injury did not cause it. I would affirm the Department's causation decision. Because a work-related injury did not cause Brewer's present condition, it is unnecessary to address whether the condition disables him.

[¶93.] DEVANEY, Justice, joins this writing.